Marvin KAGAN, et al.,
Plaintiffs–Appellants,

v.

EDISON BROTHERS STORES, INC.
and Edison Brothers Apparel
Stores, Inc., Defendants–Appellees.

No. 89–3458.

United States Court of Appeals,
Seventh Circuit.

Argued June 8, 1990.
Decided July 18, 1990.

Stephen C. Shamberg, Chicago, Ill., for plaintiffs-appellants.

Fred H. Bartlit, Jr., Ann M. Hamilton, Chaim T. Kiffel, Kirkland & Ellis, Chicago, Ill., for defendants-appellees.

Before CUDAHY and EASTERBROOK, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

EASTERBROOK, Circuit Judge.

The stockholders and debenture holders of Ringo, Inc., a closely held corporation that operated two apparel stores in Chicago, entered into negotiations with Edison Brothers Stores, Inc., for the sale of their shares (and derivatively of Ringo itself). Edison Brothers balked at signing a contract, and the deal collapsed. In the meantime, believing that Edison wanted Ringo to expand, Ringo had signed a lease for a third store, taking expensive space in a fancy new building on the Magnificent Mile of Michigan Avenue. The new store was too much for this little corporation, which filed a bankruptcy petition one month after Edison Brothers said it would not buy the shares. Ringo is being liquidated, and its creditors will receive only a few cents on the dollar. The investors want to do better

for themselves. They demand that Edison Brothers pay them the full $950,000 they would have received had the deal been consummated.

Because the statute of frauds blocks any effort to obtain this relief under the law of contracts, the investors deploy two different theories: (1) that failure to complete the acquisition violated § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and the SEC's Rule 10b–5, 17 C.F.R. § 240.10b–5, and (2) Edison committed common law fraud by making a promise it intended to disdain. The district court dismissed the complaint under Fed.R. Civ.P. 12(b)(6), concluding that the shareholders could not establish the "loss causation" that is an essential ingredient of either claim. 1989 WL 134657, 1989 U.S. Dist. LEXIS 12176 (N.D.Ill.). Edison Brothers' withdrawal would not have caused the investors any injury had Ringo not folded under them. Edison Brothers might be responsible for that failure if, as the investors assert, Edison misled Ringo's board into signing the fateful lease. But *that* claim, the district court concluded, belongs to Ringo, not to the investors. The court added for good measure that the action under Rule 10b–5 must be dismissed in any event because there was neither a purchase nor a sale of securities. We start with this latter conclusion.

■ Section 10(b) and Rule 10b–5 apply only to fraud "in connection with the purchase or sale" of securities. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). Section 2(3) of the Securities Act of 1933, 15 U.S.C. § 77b(3), defines a sale as a "contract of sale or disposition of a security ... for value". The '34 Act provides that "sale" shall "include any contract to sell or otherwise dispose of", § 3(a)(14), 15 U.S.C. § 78c(a)(14). Although there was no "sale"

in the sense of a transfer or disposition of the interests in Ringo, both statutes provide that sales include "contracts" for sale. Does "contract" include an oral agreement that is not enforceable because of the statute of frauds in § 8–319 of the Uniform Commercial Code? The district court held, following *Pelletier v. Stuart–James Co.*, 863 F.2d 1550 (11th Cir.1989), that a "contract" for purposes of the securities laws means an *enforceable* contract, a conclusion with which we agree.

"Contract" in the securities acts is a word of legal art. Without signed writings, consideration, and the other legal requirements for enforcement, there is no "contract"; there is only a promise. This is not mindless formalism. *Blue Chip Stamps* stressed the substantial problems of proof and high risk of error entailed in litigating claims that fraud prevented a sale from occurring. Statutes of frauds likewise are concerned with problems of proof. It is easy to *say* that there was an oral agreement. Section 8–319 of the UCC increases certainty in commercial life by preventing the enforcement of oral agreements to purchase or sell securities. The statute of frauds would be a hollow doctrine if disappointed sellers could convert their contract claims into actions under Rule 10b–5. The principles animating § 8–319 and the doctrine of *Blue Chip Stamps* alike require a conclusion that an unenforceable oral agreement is not a "contract" to purchase or sell securities.* The district court properly dismissed the securities claim. Because diversity of citizenship provides an independent jurisdictional basis for the state-law claim of fraud, we turn to it.

■ The district court held that Ringo would be the only proper plaintiff. Two ways to get there come to the same thing: the court observed that any fraud commit-

---

* The investors rely on *Threadgill v. Black*, 730 F.2d 810 (D.C.Cir.1984), which, they say, holds that oral agreements may support actions under Rule 10b–5. *Threadgill* does not set out enough of the facts for us to know what happened, but it reveals that the certificates were paid for, at least in part (the buyer paid at least $10,000), which makes the promise enforceable to that

extent. *Threadgill* did not mention the UCC or give a reason for its conclusion that the agreement was a "contract" under the securities laws. We do not understand *Threadgill* to hold that an oral agreement that could not be enforced in any respect under § 8–319 of the UCC is nonetheless a "sale" within the meaning of the securities laws.

ted against the investors did not cause the corporation's loss (the "loss causation" route, see *Bastian v. Petren Resources Corp.*, 892 F.2d 680 (7th Cir.1990); *LHLC Corp. v. Cluett, Peabody & Co.*, 842 F.2d 928, 931 (7th Cir.1988)), and that the investors seek recovery for an injury done the corporation (the "derivative injury" route). In either case, the nub of the problem is that the investors' injury flows not from what happened to them (Edison Brothers did not buy the stock) but from what happened to Ringo (it failed, making their stock worthless). Ringo's creditors in bankruptcy are entitled to the damages for injury done it, and the investors' effort to get 100¢ on the dollar while the creditors get next to nothing is improper. See *Mid-State Fertilizer Co. v. Exchange National Bank*, 877 F.2d 1333, 1335–36 (7th Cir. 1989). Recovery by the corporation ensures that all of the participants—stockholders, trade creditors, employees, and others—recover according to their contractual and statutory priorities. Direct recovery outside of bankruptcy defeats those priorities.

The investors recognize the venerable principle that stockholders and bondholders may not recover for the firm's injuries but say that it does not apply: Edison Brothers deceived *them*, and this direct injury entitles them to direct recovery. See, e.g., *Spartech Corp. v. Opper*, 890 F.2d 949, 954 (7th Cir.1989); *Grogan v. Garner*, 806 F.2d 829, 834 (8th Cir.1986); *Zokoych v. Spalding*, 36 Ill.App.3d 654, 344 N.E.2d 805 (1st Dist.1976). The difficulty with their position is that the deceit is not coupled with the injury. Only Ringo's demise provides the injury, so the investors' loss is derivative. To see the difference, consider a hypothetical. Two bidders vie to purchase the stock in Firm. Bidder # 1 offers $6 per share, Bidder # 2 offers $5. Investors accept Bidder # 1's offer. Bidder # 1 does not close the deal. If nothing else happens, Investors are entitled to $1 per share, the difference between the bids. Their stock is still worth $5 per share, so damages exceeding $1 would overcompensate them. Now suppose that shortly after Bidder # 1 balks, an earthquake destroys Firm's as-

sets, making the stock worthless. The investors' direct injury is still only $1, which is all they may recover from Bidder # 1; to get the other $5, Firm will have to collect on its insurance and pay out the proceeds according to contractual priorities. Bidder # 1 would not owe an extra $5 per share if Firm chose not to carry insurance, because it did not cause Firm's loss and hardly sold the investors earthquake insurance. Damages are measured as of the date of breach, not as of some later time. If instead of an earthquake Firm suffers a business reverse, the principle is the same; Bidder # 1 still owes only $1. If Bidder # 1 bears responsibility for Firm's collapse, it may have to compensate Firm for the injury inflicted, but the payment is made *to Firm* (so that it may be apportioned among all claimants) rather than to Investors (which may leave other claimants holding the bag). *Poliquin v. Sapp*, 72 Ill.App.3d 477, 28 Ill.Dec. 615, 390 N.E.2d 974 (4th Dist.1979).

Plaintiffs did not suffer direct injury. They do not contend that but for Edison Brothers' feigned interest they would have sold the stock to someone else; they do not seek to recover the benefit of an attractive bargain. Ringo's collapse is responsible for the entire loss. And although the investors say that it was Edison Brothers' statements to them that led Ringo's board to execute the lease, this is an over-simplification. Only a few of the 17 investors served on Ringo's board. Misstatements to its members in their capacity as Ringo's officers are wrongs committed against Ringo itself. Plaintiffs' description of Edison Brothers' motive reveals the indirect nature of the loss. They say that Edison Brothers entered into negotiations to obtain access to Ringo's business methods and trade secrets; once Edison Brothers got what it wanted, it called off the deal. Theft of trade secrets is an injury to the corporation, for which it is the proper plaintiff.

The investors are asking us to disregard Ringo's corporate form. They want us to see that corporations are not distinct entities but complex contractual arrangements

among investors and other venturers. True enough, but these contracts have legal effects, and respect for the corporate form is among them. Although the plaintiffs want us to allow them to recover for injuries mediated through Ringo, they most assuredly do *not* want us to hold them liable for Ringo's debts. They seek the best of both worlds: limited liability for debts incurred in the corporate name, and direct compensation for its losses. That cushy position is not one the law affords. Investors who created the corporate form cannot rend the veil they wove. *Kush v. American States Insurance Co.*, 853 F.2d 1380 (7th Cir.1988); *In re Deist Forest Products, Inc.*, 850 F.2d 340 (7th Cir.1988).

AFFIRMED.