In the

# United States Court of Appeals

## For the Seventh Circuit

No. 05-3459

JAMES D. MASSEY AND DENNIS E. MURRAY, SR.

*Plaintiffs-Appellants*,

*v.*

MERRILL LYNCH & CO., INC.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 04-C-1409—**Richard L. Young**, *Judge.*

ARGUED APRIL 5, 2006—DECIDED SEPTEMBER 14, 2006

Before EVANS, WILLIAMS, and SYKES, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Plaintiffs-appellants James Massey and Dennis Murray, former directors of Conseco, Inc., sued appellee Merrill Lynch, claiming that Merrill Lynch committed fraud and breached its fiduciary duty by providing an intentionally misleading opinion to Conseco's Board of Directors (the "Board") pertaining to the financial soundness of Conseco's proposed acquisition of Green Tree Financial Corporation ("Green Tree"). Because the plaintiffs' claims are solely derivative claims and can only be brought on behalf of the corporation (Conseco), we affirm the district court's dismissal of the plaintiffs' claims.

## I.  BACKGROUND

During the time period pertinent to this lawsuit, Conseco was a large-scale Indiana corporation that sold, among other things, insurance, annuities, and other financial services. From 1994 through 2000, Massey and Murray served as outside directors on Conseco's Board and also served on Conseco's audit committee. The present lawsuit revolves around Conseco's ill-fated purchase of Green Tree, a company whose main business focused on purchasing and servicing trailer home mortgages. In April 1998, Conseco retained defendant Merrill Lynch to provide an opinion pertaining to Conseco's proposed valuation of the Green Tree acquisition. The parties hotly dispute the scope and nature of Merrill Lynch's opinion, but at the motion to dismiss stage we must credit the plaintiffs' version of the events.

According to the plaintiffs, Merrill Lynch knew that its so-called fairness opinion pertaining to Conseco's proposed valuation of Green Tree was "essential" to the Green Tree purchase, and that Conseco's Board would rely upon it. On April 6, 1998, Merrill Lynch provided an opinion letter in which it stated that Conseco's proposed exchange ratio of stock (which implicitly valued Green Tree in the approximate range of $7 billion) was "fair from a financial point of view." The plaintiffs allege that on that same day, Merrill Lynch made an oral presentation to Conseco's Board to "induce Conseco to complete" the Green Tree acquisition. Significantly, "Merrill Lynch purported to completely and expertly examine the operations of Green Tree to determine: the viability of its business model; the value of its assets; the availability of financial wherewithal to operate the business of Green Tree" and other in-depth financial analyses. (None of these purported analyses were included in the opinion letter provided by Merrill Lynch.) The plaintiffs also allege, on information and belief, that there was an "internal debate" and "serious doubts" among

Merrill Lynch personnel as to whether it could issue such a fairness opinion in light of the "dismal underlying facts concerning the proposed Green Tree Acquisition." According to the plaintiffs, these well-founded doubts were disregarded by Merrill Lynch in favor of securing a $22 million fee, as well as ensuring future underwriting and investment banking opportunities.

The Green Tree acquisition turned out to be an unmitigated disaster for Conseco. Within two years of Conseco's purchase, Green Tree (now renamed "Conseco Finance") had suffered catastrophic losses, losing over 90% of its original $7 billion-plus valuation. In 2002, Conseco entered bankruptcy proceedings. According to the plaintiffs, the Green Tree acquisition was the pivotal event that precipitated Conseco's bankruptcy.

The plaintiffs claim they suffered damages because they purchased and/or retained large amounts of Conseco stock (which has since become worthless) based upon Merrill Lynch's alleged misrepresentations. Specifically, the plaintiffs purchased large amounts of stock through Conseco's stock purchase program (the "D&O Program"), which allowed directors and officers of Conseco to purchase large stock through personal loans provided by a bank. The bank loans were collateralized by the purchased Conseco stock. But the banks were not financially foolish: they required Conseco to guarantee the loans (and Conseco generously did so, although it retained recourse to recover funds from the employee participants if it incurred a loss under the guarantee). In addition, Conseco fronted the interest payments for the loans. Thus, through the D&O Program, participants were able to purchase huge amounts of Conseco stock with apparently no money upfront.

Perhaps not surprisingly, Conseco's D&O Program was a financial disaster, at least for the company and the shareholders who participated in the D&O Program. *See gener-*

*ally* Mitchell Pacelle and Joseph T. Hallinan, *Dispute Breaks Out Over Conseco Loans*, Wall St. J., Oct. 22, 2002, at C1. In total, Conseco guaranteed approximately $557.6 million in bank loans for 170 Conseco executives and directors to buy shares. But these numbers are deceiving: although 170 individuals participated in the program, the vast majority of the shares (approximately 17.3 million of the 19 million shares acquired under the D&O Program) were purchased by only fifteen individuals, the majority of whom were either directors or high-ranking executives. As of 2002, Murray's outstanding loan balance was approximately $100 million and Massey's balance was approximately $15 million. Very little of the $500 million-plus outstanding amount was repaid by directors and officers and, due to Conseco's guarantee, banks turned directly to Conseco for repayment. During the bankruptcy reorganization, the "new" (post-bankruptcy) Conseco acquired (or subrogated) the rights to collect on the outstanding loans provided to the plaintiffs, and now seeks repayment from the plaintiffs.

The present complaint is the plaintiffs' third attempt to draft a viable complaint. The first two complaints were dismissed because the plaintiffs included either a party in bankruptcy (Conseco), which would have converted this case to an adversary proceeding in bankruptcy court, or non-diverse parties (certain partners from PricewaterhouseCoopers),[1] which defeated federal jurisdiction. The district court dismissed the present amended complaint with prejudice, holding that the plaintiffs' claims were based solely on the diminution of Conseco's stock value and, as a result, their claims were derivative in nature— *i.e.*, could be brought only on behalf of Conseco itself and therefore could not support a direct action brought

---

[1] The plaintiffs are pursuing separate claims against PricewaterhouseCoopers in state court.

individually by the plaintiffs. They now appeal this decision.

## II. ANALYSIS

We review the district court's grant of a Rule 12(b)(6) motion to dismiss de novo, examining only the pleadings, taking all the facts pled as true, and construing all inferences in favor of the plaintiffs. *Thompson v. Illinois Dep't of Prof'l Regulation*, 300 F.3d 750, 753 (7th Cir. 2002). A complaint should only be dismissed if there is no set of facts, even hypothesized, that could entitle a plaintiff to relief. *See generally Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901-02 (7th Cir. 2004). In addition, we will consider the exhibits attached to a complaint, but, where an exhibit conflicts with the allegations of the complaint, the exhibit typically controls. *Centers v. Centennial Mortg., Inc.*, 398 F.3d 930, 933 (7th Cir. 2005). Thus, a plaintiff "may plead himself out of court by attaching documents to the complaint that indicate that he or she is not entitled to judgment." *Id.*

The central issue in this appeal is whether the plaintiffs have standing to bring these claims as a direct action, or, put another way, whether their claims are solely derivative in nature and therefore belong (or belonged) to Conseco or the bankruptcy trustee. We look to the state law of Conseco's incorporation (Indiana, in this case) to determine whether the plaintiffs' claims are derivative or direct. *See Boland v. Engle*, 113 F.3d 706, 715 (7th Cir. 1997). Indiana law adheres to the well-established corporate law principle "that shareholders of a corporation may not maintain actions at law in their own names to redress an injury to the corporation even if the value of their stock is impaired as a result of the injury." *Barth v. Barth*, 659 N.E.2d 559, 560 (Ind. 1995) (citing *Moll v. S. Cent. Solar Systems, Inc.*, 419 N.E.2d 154, 161 (Ind. 1981)); *Knauf Fiber*

*Glass, GMBh v. Stein*, 622 N.E.2d 163, 165 (Ind. 1993); *Mid-State Fertilizer Co. v. Exchange Nat'l Bank of Chicago*, 877 F.2d 1333, 1335-37 (7th Cir. 1989); *Twohy v. First Nat'l Bank of Chicago*, 758 F.2d 1185, 1194 (7th Cir. 1985); *see generally* A.L.I., *Principles of Corporate Governance*: *Analysis and Recommendations* § 7.01 (1992); 12 B. W. Fletcher *Cyclopedia of the Law of Private Corporations*, § 5911 (rev. perm. ed. 1984). That is, "[g]enerally speaking, the stockholders of a corporation for the purposes of litigation growing out of the relations between the corporation and a third person, surrender their personal or individual entities to the corporation in which they are stockholders." *Scott v. Anderson Newspapers, Inc.*, 477 N.E.2d 553, 563 (Ind. App. Ct. 1985). As a result, when a corporation suffers injury, either from corporate insiders or, as in this case, from a third party, it is the corporate entity—not the individual shareholders—who retains the cause of action. *Id.* As a result, any claims that belong to the corporation must be made derivatively (*i.e.*, brought in the name and on behalf of a corporation), and any resulting recovery flows to the corporate coffers.

In contrast, a shareholder may bring a direct action (*i.e.*, an action on behalf of an individual shareholder or a class of shareholders) to vindicate rights that belong to shareholders. For instance, a shareholder can generally bring an action to enforce voting rights, compel dividends, prevent oppression or fraud against minority shareholders, inspect corporate books, or compel shareholder meetings. *See, e.g.*, *Marcuccilli v. Ken Corp.*, 766 N.E.2d 444, 449 (Ind. App. Ct. 2002).[2] In addition, Indiana law allows a shareholder to bring a direct action when the

---

[2]  There are certain exceptions under Indiana law for closely-held corporations, but these do not apply in the context of a publicly-traded company like Conseco. *See Marcuccilli*, 766 N.E.2d at 450; *Barth*, 659 N.E.2d at 562.

shareholder has suffered a distinct personal injury that is different from the type experienced by the other shareholders. *Knauf*, 622 N.E.2d at 165; *Sacks v. Am. Fletcher Nat'l Bank & Trust Co.*, 279 N.E.2d 807, 811-12 (Ind. 1972); *Buschmann v. Prof'l Men's Ass'n*, 405 F.2d 659, 662 (7th Cir. 1969). For instance, a shareholder may maintain a direct action against a third party who harmed a corporation if the shareholder had a separate contractual agreement with the third party or the corporation that exposed the shareholder to a unique harm, different than general diminution of share price, such as personal exposure on a loan guarantee. *See, e.g., Sacks*, 279 N.E.2d at 811-12; *Buschmann*, 405 F.2d at 662.

Determining when a shareholder has suffered a distinct and separate injury from that suffered by other shareholders is not without complication. As an initial matter, whenever a corporation is harmed by a third party, the shareholders are also harmed, albeit indirectly. Corporate losses are investor losses as well, even though the losses may not be equal across the investors, but rather proportionate to the number (or type) of shares an investor holds. Nonetheless, the long-standing rule is that a harm to a corporation that harms a shareholder only through a diminution in share price cannot amount to "a distinct and separate injury" because all shareholders are essentially harmed in the same manner. *See Twohy*, 758 F.2d at 1194 (7th Cir. 1985) ("Under general principles of United States corporate law . . . a stockholder of a corporation has no personal or individual right of action against third persons for damages that result indirectly to the stockholder because of an injury to the corporation."); *Flynn v. Merrick*, 881 F.2d 446, 449 (7th Cir. 1989).

There are sound policy considerations to support a firm distinction between direct and derivative actions. *See generally Barth*, 659 N.E.2d at 561 (detailing policy rationale for shareholder standing rule); *Huffman v. Ind. Office*

*of Env. Adjudication*, 811 N.E.2d 806, 814 (Ind. 2004) (same); *Pfaffenberger v. Brooks*, 652 N.E.2d 884, 886 (Ind. Ct. App. 1995) (same). For instance, prior to filing a derivative lawsuit, a plaintiff must typically surmount several procedural hurdles, including placing a formal demand upon the corporation's board of directors, or, alternatively, establishing that such a demand would be futile. *See generally In re Guidant Shareholders Derivative Litigation*, 841 N.E.2d 571, 572 (Ind. 2006). The underlying rationale for these requirements is that corporate directors are presumed to have the best interests of a corporation in mind and therefore should have an initial opportunity to investigate the merits of a potential lawsuit and respond accordingly. *See Huffman*, 811 N.E.2d at 814. This demand requirement is not an empty formality: the interests of a shareholder seeking to vindicate corporate rights may well diverge from the best interests of a corporation (and, indeed, this is one of the principle justifications for distinguishing between direct and derivative actions). *Id.* ("[T]here is a concern that the real party's interests will not be taken into account if that party is not represented in the action. The shareholder and the corporation may have different interests and goals in litigation, and the shareholder could act in ways that harm the corporation, even if unintentionally.").

In contrast, a direct action circumvents these predicate procedural requirements and, importantly, provides recovery directly to the plaintiff, rather than recovery filtered through the corporate coffers. *See generally* A.L.I., *Principles of Corporate Governance*: *Analysis and Recommendations*, § 7.01 (1992); *Frank v. Hadesman and Frank, Inc.,* 83 F.3d 158, 160 (7th Cir. 1996). As a result, disguising derivative actions as direct ones is a particularly appealing strategy to circumvent the recovery priorities of corporate creditors established in the bankruptcy code. *See Kagan v. Edison Bros. Stores, Inc.*, 907 F.2d 690, 692

(7th Cir. 1990) (noting that direct recovery improperly circumvents creditors in bankruptcy proceedings); *Mid-State Fertilizer Co.*, 877 F.2d at 1335-37 (same). But, irrespective of the bankruptcy context, allowing direct recovery when the action is properly a derivative one fails to protect corporate creditors because the proceeds avoid the legal ordering of creditors and investors. *See Kagan*, 907 F.2d at 692. ("Recovery by the corporation ensures that all of the participants—stockholders, trade creditors, employees and others—recover according to their contractual and statutory priorities.") Furthermore, allowing a derivative action to proceed as a direct one allows for the possibility of multitudinous litigation brought by shareholders *and* the corporation, with the corresponding risk of double-counting (and double-punishment). *See Huffman*, 811 N.E.2d at 814. Thus, maintaining a clear distinction between direct and derivative actions keeps everything in its right place.

Against this legal and policy backdrop, it is clear that the plaintiffs' claims here are properly characterized as derivative in nature. On its face, the plaintiffs' complaint alleges a near-classic derivative injury: a third party (Merrill Lynch) allegedly caused harm to a corporate entity (Conseco), resulting in a diminution in the value of the corporation's stock, which in turn caused the plaintiffs' harm. Although the plaintiffs add some wrinkles to this classic scenario (which we address below), their allegations nonetheless fall squarely within the types of harm that affect all shareholders. Put another way, generalized declines in a corporation's share price based upon third party acts are harms to the corporation, and are therefore properly redressed solely through a derivative action brought on behalf of the corporation. *See*, *e.g.*, *Kagan,* 907 F.2d at 692; *Mid-State Fertilizer Co.*, 877 F.2d at 1335.

The plaintiffs attempt to circumvent these fundamental corporate law principles by arguing that they are not

"ordinary shareholders" and, moreover, have suffered an injury separate and distinct from other shareholders—that is, an injury that is not solely based upon a general decline in the value of Conseco's stock. The crux of the plaintiffs' argument is that their participation in Conseco's D&O Program created a separate and distinct injury. Specifically, they contend that they were damaged because, as participants in the D&O Program, they are now "at risk of personal liability on loans for which they and Conseco assumed responsibility." But the fact that the plaintiffs borrowed money to purchase stock (with the interest charges fronted by Conseco) and are now on the hook to pay those personal debts does not alter the nature of their claims. The *method* by which a shareholder funds a stock transaction does not alter the fundamental *nature* of the injury, which remains the critical inquiry here. The injury experienced by the plaintiffs was the diminution in Conseco's share price. Without the plunge in share prices, the plaintiffs would have no damages because the collateral on their loans (*i.e.*, the Conseco shares) would have value. And although the plaintiffs tip-toe around this fundamental problem in their briefs, the allegations in their complaint forthrightly acknowledge this: "Plaintiffs were damaged by Merrill Lynch's misrepresentations and omissions because they are exposed to potential liability on the D&O Loans *because the stock which the loans were used to purchase became worthless as a result of the Green Tree purchase.*" Pls. App. at A-23 (Compl. at ¶ 78) (emphasis added).

The authority that the plaintiffs cite to support their position is inapposite. Instead, these cases stand only for the well-established proposition that a plaintiff may bring a direct action when the plaintiff has a *separate* contractual agreement that exposes the plaintiff to an injury that is distinct (*i.e.*, personal) from the injury suffered by other shareholders. For instance, in *Sacks*, 279 N.E.2d at 809, the plaintiff shareholder provided a personal

guaranty to a corporate loan, purportedly under the assumption that a third-party bank would continue funding the corporation. The bank did not continue funding, the guaranty was called upon, and the plaintiff brought both a derivative and direct action against the third-party bank. *Id.* The Indiana Supreme Court held that the plaintiff could maintain a direct action because the personal guaranty arose from "a breach of a duty owed specially to the stockholder separate and distinct from the duty owed to the corporation." *Sacks*, 279 N.E.2d at 811. Similarly, in *Buschmann,* 405 F.2d at 661, the plaintiff provided a personal guaranty to a corporation's debt, which was called upon by the bank when the corporation's indebtedness reached excessive levels. Applying Indiana law, this court held:

> Notwithstanding the fact that the corporation has a cause of action against the defendant for mismanagement, Buschmann has a personal cause of action against the defendant to recover damages for breach of the contract, even though the corporate cause of action and Buschmann's cause of action result from the same wrongful acts. The defendant made promises directly to Buschmann the breach of which gave rise to a cause of action. Buschmann's cause of action is manifestly personal and not derivative since his liability to pay the corporation's indebtedness to the Bank, which is his principal item of damage, does not arise from his status as a stockholder of the corporation.

*Id.* at 663.

Thus, *Sacks* and *Buschmann* fall squarely within the general rule distinguishing direct and derivative actions: a shareholder who suffers a separate and distinct injury different from that of other shareholders may maintain a direct action. In both *Sacks* and *Buschmann* the injury was based upon a contractual duty to guarantee

corporate loans, which was an entirely separate duty from the ones owed by other shareholders. Here, the plaintiffs can point to no such agreement because they did not agree to guarantee any of Conseco's debts, nor did they have any form of agreement with Merrill Lynch.

But we need not focus on the contractual formalities because the more important distinction is not the form, but rather the *function* of the plaintiffs' obligations to the corporation and the third party, from which springs their injuries. In *Sacks* and *Buschmann*, the plaintiffs undertook specific contractual duties primarily aimed at benefitting the corporation (*i.e.*, guaranteeing corporate loans). They were injured in two ways when the corporation's fortunes turned south. First, like the plaintiffs in this case, they lost the value of their shares. That is a generalized injury to all shareholders and is properly considered a derivative injury. Second, unlike the plaintiffs in this case, they suffered out-of-pocket costs—*additional* losses from the diminution in share price—because their guarantee of corporate loans was called upon by either the corporation or the bank. It is this separate and distinct injury that stands apart from the one suffered by the other shareholders and which therefore provides the toehold for a direct action. And the plaintiffs here can show no such injury because they cannot claim any cognizable injury aside from the diminution in share value. Put another way, the plaintiffs have experienced no out-of-pocket losses or other infringement of rights, aside from the requirement to repay the funds that were loaned to them to purchase stocks—and, as discussed above, this injury is essentially indistinguishable from the injury suffered by all shareholders.

To hold otherwise would lead to an absurd result. Under the plaintiffs' theory, any shareholder who funded a stock purchase through any form of loan—whether a margin loan, an advance on a home equity line or even a loan from relatives—could claim a separate and distinct in-

jury because they were now "personally liable" on a loan instrument. But merely being required to pay for the shares that one purchased surely cannot be a distinct injury that opens the doors to direct recovery, ahead of all the other shareholders, who equally lost the value of their investments. If anything, the plaintiffs faired better than the "ordinary shareholders" because they effectively lost their money significantly *later* than the investors who paid cash upfront for their shares. Thus, the plaintiffs at least enjoyed the time-value benefit of their money, including the option to place these funds in more lucrative investments—and, as it turned out, virtually *any* investment other than tying up cash in Conseco shares was a better investment alternative. As a result, allowing the plaintiffs to skip now to the front of the recovery line is not only contrary to controlling case law, but would also be a highly inequitable result.

The plaintiffs offer a second, related argument as to why they have suffered a separate and distinct injury. They contend that they, unlike "ordinary shareholders," acted in reliance on Merrill Lynch's alleged fraudulent communications. That is, according to the plaintiffs, during its presentation to the Board, Conseco allegedly made numerous misrepresentations relating to its investigation of Green Tree's financials. The plaintiffs, in turn, retained or purchased additional shares through Conseco's D&O Program based upon Merrill Lynch's statements. These allegations, however, run headlong into the same difficulty outlined above: irrespective of Merrill Lynch's misrepresentations, the plaintiffs' damage is exclusively the result of a generalized decline in Conseco's share price, which, again, is a derivative injury.

Setting this aside, the plaintiffs also cannot prevail under this theory because the allegations in their complaint, along with the attached exhibits, plainly establish that Merrill Lynch's representations were to the corporation, via its proxy, the Board, and *not* to the plaintiffs as individual

shareholders. Now, as a general concept, a party need not plead much to survive a motion to dismiss: a party need not plead specific facts,[3] legal theories, nor anticipate any defenses. *See generally, Xechem, Inc.*, 372 F.3d at 901-02; *Centers*, 398 F.3d at 933. The dangers almost always come from pleading too much—not too little. *See id.* Thus, a party may plead itself out of court by either including factual allegations that establish an impenetrable defense to its claims or by attaching exhibits that establish the same. *Id.* Here, the plaintiffs have done both.

The plaintiffs do not allege that Merrill Lynch made any misrepresentations to them as individual shareholders. To the contrary, the allegations in the complaint consistently state that Merrill Lynch was retained by Conseco and made representations to Conseco or the Board. In other words, the plaintiffs were acting solely in their capacity as board members, and this is fatal to the plaintiffs' claims because misrepresentations to investors in their capacity as corporate officers or directors are wrongs committed against the corporation, not wrongs against the individuals. *See Kagan*, 907 F.2d at 692. In addition, the plaintiffs allege only that "[a]s a result of its relationship and superior knowledge, Merrill Lynch owed a fiduciary duty *to Conseco and its Board.*" Pls. App. at A-21 (Compl. at ¶ 64) (emphasis added). To the extent that the allegations in the complaint do not establish as a matter of law that Merrill Lynch's representations were to the plaintiffs solely in their capacity as board members, the exhibits to the complaint firmly cement this. *See Centers*, 398 F.3d at 933. Merrill Lynch's retention and opinion letters, which are attached as

---

[3] There are, of course, certain exceptions to this, such as the particularity requirements for allegations of fraud under Rule 9(b). Because the plaintiffs here cannot plead any cause of action, we need not address whether their allegations are sufficient under Rule 9(b).

exhibits to the complaint, unambiguously establish that Merrill Lynch's duties ran exclusively to Conseco, not the plaintiffs as individual investors. For instance, the opinion letter states, in pertinent part:

> This opinion is for the use and benefit for the Board of Directors of the Acquiror [Conseco]. Our opinion addresses only the financial fairness of the Exchange Ratio, and does not address the merits of the underlying decision by the Acquiror to engage in the Merger, and does not constitute a recommendation to any stockholder as to how such stockholder should vote on the proposed merger or any matter related thereto.

Pls. App. at A-32.

Thus, even when reading the allegations and the exhibits in the light most favorable to the plaintiffs, the plaintiffs cannot establish that Merrill Lynch's purported misrepresentations breach a duty owed to them, rather than to the corporation. And so, once again, we return to the corporate nature of the alleged injury and the requirement of derivative action here.

As a final note, it would be a curious—and unfair—result if, as the plaintiffs argue, corporate insiders were permitted to maintain direct actions that "ordinary shareholders" could not bring. Such a result would provide greater protections to insiders, who presumably have the greatest access to information on the future prospects of a corporation. Those with the most well-informed front-end risk assessments would also receive the greatest financial protections at the back-end of a deal gone wrong. This would invert the basic structure of corporate and securities fraud laws, particularly the prohibitions on insider trading, which generally aim to curtail trading advantages by corporate insiders and protect investors from

such abuses.[4] *See generally S.E.C. v. Maio*, 51 F.3d 623, 630-31 (7th Cir. 1995); William M. Fletcher, *Cyclopedia of the Law of Private Corporations*, § 900.65. ("Under Section 10(b) and Rule 10b-5, a person trading in the securities of a corporation who has access, directly or indirectly, to information intended to be available only for a corporate purpose and not for anyone's personal benefit may not take advantage of that information knowing that it is unavailable to public investors."); Ian B. Lee, *Fairness and Insider Trading*, 2002 Colum. Bus. L. Rev. 119 (2002) (discussing the negative effects of information disparity on market "fairness"); *cf.* Henry G. Manne, *Insider Trading: Hayek, Virtual Markets, and the Dog that Did Not Bark*, 31 J. Corp. L. 167 (2005) (discussing and collecting authority supporting the argument that insider trading promotes market efficiencies). We are not inclined to create such a generous exception to bedrock corporate law principles, and instead hold that the plaintiffs must take their proper place in the recovery line along with all other investors.

## III.  CONCLUSION

For the foregoing reasons, we AFFIRM the district court's dismissal of the plaintiffs' complaint.

---

[4] We note, in passing, that the plaintiffs' allegations that, as members of the Board, they relied upon confidential information presented by Merrill Lynch to make trades in Conseco's stock could run headlong into the prohibited domain of insider trading. *Cf.* 17 C.F.R. § 240.10b-5; *see, e.g., Maio*, 51 F.3d at 631 (7th Cir. 1995) (noting that "[t]rading on the basis of material nonpublic information violates these sections where the trading arises 'in connection with' a breach of a fiduciary duty"). Because this issue was unexplored in the briefing, we decline to address it here.

No. 05-3459 17

A true Copy:

Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*

USCA-02-C-0072—9-14-06