In the

# United States Court of Appeals
## For the Seventh Circuit

No. 13-2818

FORTUNEE MASSUDA,

*Plaintiff-Appellant,*

*v.*

PANDA EXPRESS, INC., *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 12 C 9683 — **Ronald A. Guzmán**, *Judge.*

ARGUED JANUARY 22, 2014 — DECIDED JULY 21, 2014

Before WOOD, *Chief Judge*, and MANION and WILLIAMS,
*Circuit Judges*.

WOOD, *Chief Judge*. This case concerns an ill-fated investment that Fortunee Massuda made in a group of Panda Express restaurants. In hindsight, Massuda's mistake was to entrust $4,000,000 in 1997 with Tony Rezko, who controlled several companies that owned and operated the restaurants and who hoped to expand the business. Rezko wound up indicted and convicted on federal fraud and bribery charges,

for which he received a lengthy prison sentence in 2011. See *United States v. Rezko*, 776 F. Supp. 651, 653 (E.D. Ill. 2011). Along the way, his real estate ventures collapsed, and Massuda filed this lawsuit against Rezko's corporations and associated people. In it, she raised claims of unjust enrichment, fraud, and aiding and abetting a breach of fiduciary duty. (The parties are of diverse citizenship and the amount-in-controversy requirement of 28 U.S.C. § 1332 is plainly met.) The district court concluded that all of Massuda's claims, except portions of her fraud claim, were derivative, and on that ground dismissed those counts with prejudice for failure to state a claim upon which relief could be granted. See FED. R. CIV. P. 12(b)(6). After Massuda passed up the court's invitation to amend her fraud allegations, it wrapped up the case by dismissing the fraud claim as well. This appeal followed. Finding no error in the district court's rulings, we affirm its judgment.

## I

Our account of the facts is as generous to Massuda's viewpoint as the complaint will permit, given the fact that her suit was dismissed at the earliest possible stage. From 1993–98, the Rezko-Citadel partnership (RC Partnership), a joint venture between Panda Express, Inc. (Panda) and Rezko Concessions, Inc. (Concessions), owned and operated roughly 50 Panda Express restaurants in the greater Chicago area. Panda and Concessions each had a 50% interest in the RC partnership; Concessions was the general partner and Panda the limited partner. Concessions was also the majority owner of Rezko Enterprises, LLC (Enterprises), another company controlled by Rezko; Enterprises wholly owned and controlled PE Chicago, LLC (PE Chicago), a Delaware

limited liability company. In 1998, PE Chicago replaced Concessions as the general partner of the RC Partnership.

In late 1997 or early 1998, Massuda invested her $4 million in Enterprises, which by then owned and controlled PE Chicago, in exchange for an ownership interest of nearly 11%. As of 2000, the RC Partnership was valued at approximately $42.22 million; by 2001, its value had climbed to $56.4 million. Others with a stake in PE Chicago included Rezko himself, who was the managing member, and Semir Sirazi.

By 2005 it was clear that Rezko was in significant financial and legal trouble. Around April 2006, Massuda went to Panda, informed it of her intent to sue Rezko and Enterprises and asked whether Panda would be interested in buying her interest in Enterprises. Panda's general counsel, R. Michael Wilkinson, replied that Panda was uninterested because her interest was "worthless."

About a month later, in mid-May, Rezko contacted Wilkinson and asked for an urgent $3 million loan, because GE Capital was about to foreclose on his house. Wilkinson conveyed the request to Panda's Board, which turned it down. Rezko then offered to sell PE Chicago's interest in the RC partnership to Panda, if Panda would pay him $3 million immediately, keep the deal secret, and grant Rezko personally (not PE Chicago) a buy-back option. This time Panda agreed; it purchased PE Chicago's interest in the RC partnership for $9.7 million on June 1, 2006, and wired approximately $3.25 million to Rezko's personal account. No money was ever transferred to a PE Chicago account. Instead, the agreement stated that Rezko (defined to include Rezko Concessions and its affiliates as well as Rezko himself) owed Panda substantial monies and that those debts were retired

by the sale. Interestingly, the Purchase Agreement never mentions PE Chicago. As agreed, Rezko and Panda kept the sale secret.

Panda acquired PE Chicago's 50% interest in the RC Partnership for significantly less than its fair market value. Massuda was never told about the transaction, despite her substantial interest in PE Chicago through her 11% ownership of Enterprises. She was evidently not alone in this respect: it appears that none of Enterprises's members (other than Rezko) was informed about the Panda deal.

Rezko's fortunes continued to spiral downward. He was indicted by a federal grand jury in November 2006 and at that point leaves our story. It was not until 2008 that Sirazi, another one of Rezko's investors, first discovered the details of the Panda-Rezko-PE Chicago transaction. He promptly sued Panda, Panda Restaurant Group, Inc., Citadel-Panda Express, Inc., and Andrew and Peggy Cherng (the Panda defendants), claiming that they had conspired with Rezko to defraud investors and had aided and abetted Rezko's breaches of his fiduciary duties to the investors in his businesses. Sirazi later gained control over PE Chicago and added it as a co-plaintiff to his action. A jury found the Panda defendants liable to Sirazi for conspiracy and aiding and abetting a breach of a fiduciary duty, and awarded him $1,100,000 in compensatory damages and $2,000,000 in punitive damages against each of the three corporate defendants. The court dismissed all of PE Chicago's tort claims, but PE Chicago won $5,140,000 on its breach of contract claim against the Panda defendants. In the end, those judgments were vacated after the parties reached a settlement. (As far as the record shows, Massuda received no benefit from this

settlement other than the indirect effect that filtered up to her from whatever PE Chicago recovered.)

After the settlement, Massuda re-entered the picture. In the present case, she has advanced essentially the same claims that Sirazi raised against the Panda defendants. As we noted earlier, the district court ultimately dismissed her action, because most of her claims were derivative and she had not stated a claim for fraud. In this court, she argues that the court erred in so finding. She also contends that the district court should have applied judicial estoppel against Panda and that it should have allowed her to pursue her fraud theory.

## II

The district court dismissed all counts with prejudice; our review is therefore *de novo*. *Stayart v. Google Inc.*, 710 F.3d 719, 722 (7th Cir. 2013). Because PE Chicago and Enterprises are Delaware limited liability companies, the parties have assumed that Delaware law governs everything but her fraud claim. See *Massey v. Merrill Lynch & Co., Inc.*, 464 F.3d 642, 645 (7th Cir. 2006) (applying law of state of incorporation to derivative claim issue). We will follow their lead and assess this case using principles of Delaware corporate law for the two LLCs. At this point, PE Chicago has released all claims arising from this matter through its settlement, and so its interests are no longer at issue. Massuda's complaint can survive only if she alleges direct injury. For ease of exposition, we evaluate each of her theories individually.

*Count I: Unjust Enrichment*

We begin with Massuda's contention that "Defendants unjustly deprived and cheated Plaintiff out of the true and

proper value of PE Chicago's 50% interest in [the RC Partnership]." In characterizing this as direct or derivative, we look to the Delaware Supreme Court's decision in *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004), for guidance. *Tooley* held that "[t]he analysis must be based solely on the following questions: Who suffered the alleged harm—the corporation or the suing stockholder individually—and who would receive the benefit of the recovery or other remedy?" 845 A.2d at 1035. Under that test, Massuda fails at step one: if anyone was unjustly deprived of the true value of PE Chicago's interest, it was PE Chicago. Massuda was two steps away: she owned an interest in Enterprises, which owned PE Chicago, which had a 50% interest in the RC Partnership. Indeed, Massuda recognizes in her complaint that the "[d]efendants unjustly deprived and cheated Plaintiff out of the true and proper value *of PE Chicago's 50% interest* in [the RC Partnership]." It was PE Chicago that had the 50% interest in the RC Partnership and thus PE Chicago that was harmed directly. Massuda's claim is derivative.

*Count II: Fraud*

Massuda offers four theories to support her fraud allegations: (1) the Panda defendants intentionally defrauded her, PE Chicago, and Enterprises out of the fair market value of PE Chicago's 50% interest by paying Rezko personally for PE Chicago's 50% interest in the RC Partnership instead of paying PE Chicago itself; (2) the defendants falsely represented that the purchase price Panda offered for PE Chicago's 50% interest represented the fair market value; (3) the defendants made material omissions by failing to inform interested third-parties, including Massuda, of the transaction, even though they knew of her interest; and (4) the defendants

falsely and misleadingly represented to Massuda just before the purchase of PE Chicago that her interest in Enterprises (and indirectly PE Chicago) was "worthless."

Massuda argues that the Panda defendants should be estopped from arguing that her fraud claims are derivative, because they successfully argued in the Sirazi litigation that PE Chicago could not succeed on the same fraud claims. The district court correctly rejected this argument. In the earlier case, the Panda defendants did not challenge PE Chicago's standing to bring the fraud claims. They argued instead that those claims failed on the merits. The question whether the claims were barred as derivative did not come up. Judicial estoppel is designed to prevent parties from obtaining an unfair advantage by taking a present position that is inconsistent with one successfully taken in the past. See *Matter of Cassidy*, 892 F.2d 637, 641 (7th Cir. 1990). It does not prevent a party from turning to an entirely new theory. Since there is no inconsistency here, we move to the merits.

Massuda's first argument is that the Panda defendants defrauded her and others out of the fair market value of PE Chicago's interest. For the same straightforward reason we mentioned earlier, this is derivative. PE Chicago was the immediate party injured; any recovery would go to PE Chicago first, and its members second. See *Tooley*, 845 A.2d at 1035.

She next contends that the Panda defendants falsely stated the purchase price was for fair market value. We can dismiss this argument because she has not developed it on appeal. See *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("We repeatedly have made clear that perfunctory and undeveloped arguments, and arguments that are un-

supported by pertinent authority, are waived"). Even if we stretched to find it preserved, she would be no better off. A claim of common-law fraud under Illinois law requires proof of five elements: "(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from the reliance on the statement." *Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 841 (7th Cir. 2007) (internal quotation marks omitted). Massuda never alleged that the Panda defendants intended to induce her to act based on its statement, nor that she did rely to her detriment. This claim was properly dismissed with prejudice.

Massuda's next allegation is that the Panda defendants omitted material information by failing to notify her when Panda acquired PE Chicago's interest in the RC Partnership, even though they knew of her interest. See, *e.g.*, *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 571 (7th Cir. 2012) (recognizing that under Illinois law a plaintiff's fraudulent concealment claims "must allege that the defendant intentionally omitted or concealed a material fact that it was under a duty to disclose to the plaintiff."). This is the closest she came to alleging a direct claim, but as the district court properly concluded, she fell short.

The key element missing from Massuda's complaint was an allegation, supported by facts, that the defendants were under a duty to disclose material facts to her. That is so even though we have noted that Illinois courts have "found a lack of good faith where the transferee knew of a pending lawsuit against the transferor and accepted the transfer without

informing the plaintiff." *For Your Ease Only, Inc. v. Calgon Carbon Corp.*, 560 F.3d 717, 721 (7th Cir. 2009) (citing *Kennedy v. Four Boys Labor Service*, 279 Ill. App.3d 361 (1996)). One could deduce from this that Panda had a duty to inform Massuda about the sale because she informed Panda a month before the acquisition that she was suing Rezko and others. That is not, however, the theory that Massuda presented. Instead, up until her reply brief in this court, she asserted that the duty to avoid misleading omissions was rooted in her status as a minority member.

That was a mistake on her part. And while we generally would be inclined to remand with a suggestion that plaintiff be allowed to re-plead, since parties are not obligated to plead legal theories, such a move would be pointless here. Massuda already has turned down a chance to sharpen her fraud pleadings, which must meet the specificity requirements of Federal Rule of Civil Procedure 9(b). We see no reason to give her a third chance. See *Int'l Mktg., Ltd. v. Archer-Daniels-Midland Co.*, 192 F.3d 724, 727 (7th Cir. 1999) (holding that when a plaintiff "decide[s] to forgo [her] opportunity to amend the complaint and instead to pursue an immediate appeal," she makes a "strategic decision [that] mean[s] that [her] case can be resuscitated only if [she] is able to convince this court that [she] had in fact properly stated [her fraud] claim[] in the form [it] took before the district court in the unamended complaint").

The same analysis applies to the allegation that the Panda defendants falsely and misleadingly represented to Massuda that her interest in Enterprise and PE Chicago was "worthless." In dismissing, the district court found that she failed to state a claim because she failed to point to any facts to sup-

port her assertion that the defendants made the statement with the intention that it would induce her to act, that she relied on the truth of the statement, or that she suffered any damages as a result of the allegedly fraudulent statement. The district court also thought that she had not pleaded the claim with particularity, as required by Rule 9(b), because she did not adequately explain who made the statement, or where and how it was made. On appeal, the Panda defendants also argue that even assuming they did say her interest was worthless, that was a matter of opinion and not actionably false.

The latter ground does not strike us as appropriate for dismissal on the complaint. At this point, we do not know whether the statements made to Massuda were non-actionable opinions. Giving her the benefit of the doubt, it is at least debatable that Panda valued her interest at zero at the time of their conversation: Panda was then a 50% owner in the RC Partnership and thus would have had a very good idea about the partnership's worth.

The adequacy of her allegations of fraud, however, is another matter. In her complaint, Massuda explains that she called Panda's general counsel, said that she was suing Rezko, and wanted to know if Panda was interested in buying her interest in the company. At that point, she alleges, "The Defendants falsely and misleadingly represented to [plaintiff] that her interest in Enterprises and PE Chicago was 'worthless,' when Defendants instead paid millions to Rezko personally for his supposed interest in said companies." This statement, no matter how generously read, says nothing about whether (1) the defendants intended her to act on the basis of the false statement; (2) she actually relied on the

truth of the statement; or (3) she was damaged as a result of her reliance. While the district court gave plaintiff leave to amend her complaint she chose not to do so. Because Massuda cannot show an "injury [that is] independent of any alleged injury to the corporation," *Tooley*, 845 A.2d at 1039, her injury is derivative and barred by the settlement; dismissal with prejudice was proper.

*Count III: Conspiracy to Defraud*

In this count, Massuda alleged that the Panda defendants and Rezko conspired "to defraud PE Chicago and Enterprises, and those with interests in [the same]" through the sale of the RC Partnership interest at a price well below fair market value. This claim is derivative. Once again, the entity that suffered from the depressed price was PE Chicago. Massuda's injury was derivative.

*Count IV: Aiding and Abetting a Breach of Fiduciary Duty*

Count IV alleges that the Panda defendants were aware of Rezko's duties as an officer of PE Chicago and Enterprises and yet knowingly participated, assisted, and benefited from his breach of these duties via the secretive sale of the RC Partnership interest. Massuda believes that the case of *Gentile v. Rossette,* 906 A.2d 91 (Del. 2006), gets her over the derivative injury hurdle for this theory, at least.

It is no stretch to say Rezko breached many fiduciary duties, including duties to the other members of the firm. He deliberately circumvented what should have been a mandatory vote of the members. The sale of PE Chicago's interest in the RC Partnership disposed of the only asset PE Chicago had, and thus may have made that sale a fundamental corporate change. See 8 Del.C. § 271(a). By conducting the sale

without a vote, we can assume that Rezko deprived the members of their voting power and that this amounted to a harm felt directly by the members.

In *Gentile*, the corporation's CEO was also its main source of capital. As consideration for his loans, the CEO received promissory notes that were convertible into shares of company common stock. An agreement provided that the original conversion rate was $1.33 of debt per share; later it was reduced to $.75, and then $.50. Eventually the CEO thought that the company's debt to him was deterring outside investment, and so he converted two-thirds of his debt into equity. In the debt conversion, however, the CEO and another officer decided to lower the conversion rate substantially, to $.05 of debt per share. All told, the CEO received 44 million shares, significantly more than he would have received under the contractual conversion rate in place at the time ($.50).

The conversion had the effect of increasing the CEO's equity holdings from 61.9% to 93.49% of the total. The minority shareholders thus experienced a dilution of their interest from 38.81% to 6.51%. Two months after the conversion, the company, led by the CEO, negotiated a merger whereby the company's shareholders would receive approximately .49 shares of the acquirer's shares for each of its shares. The acquiring company also offered the CEO side benefits, including a put agreement whereby it would repurchase 360,000 shares of the stock the CEO received in the merger at $5 a share one year later. Neither the CEO's original conversion of his debt into undervalued stock nor the side perks were mentioned in the Information Statement sent to shareholders about the merger. The merger was approved. Later, minority

shareholders brought suit claiming that their shares had been diluted improperly by the issuance of excessive stock to the CEO.

Ultimately, after losing in the lower court (which thought that their claims were derivative), the minority stockholders prevailed in the Delaware Supreme Court. That court ruled that the debt conversion claim was both derivative and direct. 906 A.3d at 99. It said that "the debt conversion was a self-dealing corporate transaction with a significant stockholder, that increased the voting power and economic value of that significant stockholder's interest in [the company], at the expense and to the corresponding detriment of the minority shareholders." *Id.* While the court found injury to the company from the overpayment for debt, it recognized that the minority stockholders independently "lost a significant portion of the cash value *and the voting power* of their minority stock interest. Those separate harms resulted from the same transaction, yet they are independent of each other." *Id.* (emphasis added). The Court recognized a particular "transactional paradigm—a species of corporate overpayment claim" that is both derivative and direct. *Id.* That is, "[a] breach of fiduciary duty claim having this dual character arises where: (1) a stockholder having majority or effective control causes the corporation to issue 'excessive' shares of its stock in exchange for assets of the controlling stockholder that have a lesser value; and (2) the exchange causes an increase in the percentage of the outstanding shares owned by the controlling stockholder, and a corresponding decrease in the share percentage owned by the public (minority) shareholders." *Id.* at 99–100. In such cases, the minority stockholder's direct injury arises "[b]ecause the shares representing the 'overpayment' embody both economic value and vot-

ing power, the end result of this type of transaction is an improper transfer—or expropriation—of economic value and voting power from the public shareholders to the majority or controlling stockholder." *Id.* at 100.

Massuda argues that *Gentile* stands for the proposition that every time the holder of a majority interest acts in a way that helps him and hurts the minority, there is a direct claim. We do not read it so broadly, as doing so would wholly swallow *Tooley*. Instead, we understand it to stand for the more modest proposition that when a majority shareholder engages in wrongdoing in such a way as to dilute the *voting power* of the minority shareholders, minority shareholders can bring a direct suit for voting power dilution. This makes sense because a dilution of voting power is a direct harm to the shareholders that is not felt by the company.

If Massuda had alleged that Panda aided and abetted Rezko's unlawful dilution of member voting power, she would have stated a claim for a direct injury. But, at least until she filed her reply brief, which was too late, she did not. Instead, she has complained of the improvidence and wastefulness of the sale itself. But the only party directly harmed by the sale was PE Chicago. The district court properly found that Massuda cannot recover for her derivative injuries, and that she failed to state a claim for fraud.

We therefore AFFIRM the judgment of the district court.