In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 12-3474

ELLIOTT D. LEVIN, as Trustee in bankruptcy for Irwin Financial Corporation,

*Plaintiff-Appellant*,

*v.*

WILLIAM I. MILLER, GREGORY F. EHLINGER, and THOMAS D. WASHBURN,

*Defendants-Appellees*,

and

FEDERAL DEPOSIT INSURANCE CORPORATION,

*Intervenor-Appellee*.

---

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:11-cv-1264-SEB-TAB — **Sarah Evans Barker**, *Judge*.

---

ARGUED SEPTEMBER 10, 2013 — DECIDED AUGUST 14, 2014

---

Before WOOD, *Chief Judge*, and EASTERBROOK and HAMILTON, *Circuit Judges*.

EASTERBROOK, *Circuit Judge*. Irwin Financial Corporation, a holding company, entered bankruptcy when its subsidiar-

ies failed. Both subsidiaries were banks (Irwin Union Bank & Trust and Irwin Union Bank, FSB), which the Federal Deposit Insurance Corp. closed and took over in 2009. The banks' asset portfolios had been dominated by mortgage loans, whose value plunged in 2007 and 2008. The FDIC is in the process of collecting the banks' assets and paying their debts. Further details are not material to the disposition of this appeal.

Elliott Levin, Irwin Financial's trustee in bankruptcy, filed this suit against three of its directors and officers. For simplicity, we refer to Irwin Financial and the trustee collectively as "Irwin," to Irwin's two subsidiaries as "the Banks," and to the defendants as "the Managers." The FDIC intervened to defend its own interests, because whatever Irwin collects from the Managers will be unavailable to satisfy any claims that the FDIC has against them. Both the FDIC and the Managers contend that most of Irwin's claims belong to the FDIC under 12 U.S.C. §1821(d)(2)(A)(i), which says that when taking over a bank the FDIC acquires "all rights, titles, powers, and privileges of the insured depository institution, and of any stockholder, member, accountholder, depositor, officer, or director of such institution with respect to the institution and the assets of the institution". Irwin, the FDIC, and the Managers all understand this language to allocate to the FDIC not only the closed banks' rights but also any claims that investors might assert derivatively on behalf of the closed banks. Courts of appeals (including this one) routinely describe §1821(d)(2)(A)(i) the same way. See, e.g., *Adato v. Kagan*, 599 F.2d 1111, 1117 (2d Cir. 1979); *Courtney v. Halleran*, 485 F.3d 942, 950 (7th Cir. 2007); *Pareto v. FDIC*, 139 F.3d 696, 700 (9th Cir. 1998).

Irwin presented four types of claims against the Managers. The first (counts 1, 2, 4, and 5 of the complaint) asserts that the Managers violated their fiduciary duties to Irwin by not implementing additional financial controls that would have protected Irwin from the Managers' errors in their roles as directors and managers of the Banks. The Managers (as officers of the Banks) allowed the Banks to specialize in kinds of mortgages that were especially hard-hit in 2007 and 2008. Irwin contends that they should have diversified the Banks' portfolios, hedged the risk using other instruments, or both, and are liable to Irwin for failing to implement holding-company-level rules that would have compelled them to curtail bank-level risks.

Count 3 alleges that the Managers allowed Irwin to pay dividends (or, equivalently, repurchase stock) in amounts that left it short of capital when the financial crunch arrived. Irwin maintains that it would not have distributed money to investors had the Managers furnished better information about the Banks' portfolios, for then Irwin would have realized the benefit of being better capitalized.

Count 6 alleges that one of the Managers breached his duty of care by hiring unnecessary (or unnecessarily expensive) consultants, squandering Irwin's money. Irwin's reply brief abandons this claim; we do not mention it again.

Count 7 alleges that two of the Managers breached their duties of care and loyalty when in the first half of 2009 they "capitulated" to the FDIC and caused Irwin to contribute millions of dollars in new capital to the Banks. The complaint asserts that the Managers knew, or should have known, that this was equivalent to throwing money away—that it might benefit the FDIC (and could conceivably benefit

the Managers in their roles at the Banks) but held no pro-spect of benefit for Irwin.

The district court asked Magistrate Judge Baker for anal-ysis. He recommended that the first cluster of counts (1, 2, 4, and 5) be dismissed because under §1821(d)(2)(A)(i) the FDIC rather than Irwin owns any legal claim that depends on acts the Managers took in their roles at the Banks. He rec-ommended that counts 3 and 7 continue to summary judg-ment or trial. The district judge, however, concluded that all claims belong to the FDIC, and she dismissed the entire complaint. Irwin has appealed. The Managers defend the district court's decision; the FDIC does not and concedes that counts 3 and 7 belong to Irwin. (The FDIC nonetheless asks us to affirm across the board, contending that Irwin's position on these counts is substantively implausible.)

All of the litigants agree that the distinction between di-rect and derivative claims depends on Indiana law, for Irwin was incorporated there. Indiana treats a stockholder's claim as derivative if the corporation itself is the loser and the in-vestor is worse off because the value of the firm's stock de-clines. See *Barth v. Barth*, 659 N.E.2d 559 (Ind. 1995); *Massey v. Merrill Lynch & Co.*, 464 F.3d 642, 645 (7th Cir. 2006) (Indi-ana law). That's a good description of the theory behind counts 1, 2, 4, and 5: The Banks suffered a loss when the val-ue of their portfolios cratered, and Irwin suffered a deriva-tive loss when the value of its stock in the Banks plummeted. At oral argument counsel for Irwin conceded that it would not have suffered any injury unless the Banks had done so first. The theory behind these counts—that the Managers owed a duty to Irwin to protect it from their own behavior at the Banks—is a veneer over a derivative claim based on the

harm the Managers' choices caused to the Banks and transmitted to Irwin through a decline in the value of the shares it held. The FDIC, not Irwin, therefore owns any claim against the Managers that depends on the choices they made as directors or employees of the Banks. Any recovery by Irwin would be double counting. See *Mid-State Fertilizer Co. v. Exchange National Bank*, 877 F.2d 1333, 1335–36 (7th Cir. 1989); *Kagan v. Edison Bros. Stores, Inc.*, 907 F.2d 690 (7th Cir. 1990).

Count 3, by contrast, concerns only what the Managers did at Irwin—both with respect to supporting the financial distributions and with respect to the information they gave Irwin about the Banks' loan portfolios. If count 3 is dismissed, the FDIC cannot gain; it owns the Banks and all of their assets, but the Banks cannot collect from the Managers for any shortcomings in the services that they rendered to Irwin. Section 1821(d)(2)(A)(i) is designed to allocate claims between the FDIC and other injured parties; it is not designed to vaporize claims that otherwise exist after a business failure. Yet if count 3 is dismissed, the claim will disappear; no one will be able to pursue it. It would not be sensible to read §1821(d)(2)(A)(i) that way.

The potential problem with count 3 is not ownership but whether Indiana law permits recovery on a theory that a holding company distributed "too much" to its investors. As a first approximation, dividends and repurchases are a wash; stockholders gain exactly what the corporation loses. These transactions leave the firm with less capital, but this may be beneficial if it induces managers to work harder and smarter. And if the firm later lands in financial trouble, stockholders see payouts as a blessing—for the distribution means that the money was not lost with the firm's financial

distress. But the district court did not dismiss count 3 on the merits, which have not been fully briefed on appeal. Nor have the parties explored how Indiana's version of the Business Judgment Rule applies to the Managers' activities with respect to information and distributions. It was accordingly premature to dismiss this part of the complaint.

The district court thought that count 3 does not narrate a "plausible" claim, as the Supreme Court used that word in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). Yet those decisions concern the adequacy of the notice given by the pleading, not the claim's legal substance. The Court held that Fed. R. Civ. P. 8 is not satisfied by a skeletal complaint that contains conclusion or surmise and requires a court to decide whether events not pleaded could be imagined in a plaintiff's favor. The Court wrote that judges may bypass implausible allegations and insist that complaints contain enough detail to allow courts to separate fantasy from claims worth litigating. *Iqbal* and *Twombly* do not change the standards for judgment on the pleadings (Rule 12(c)) or summary judgment (Rule 56), nor do they require complaints to address potential defenses such as the Business Judgment Rule. The Court held in *Gomez v. Toledo*, 446 U.S. 635 (1980), that complaints need not anticipate affirmative defenses; neither *Iqbal* nor *Twombly* suggests otherwise. See *Richards v. Mitcheff*, 696 F.3d 635 (7th Cir. 2012). So although count 3 may not have much prospect, it could not be dismissed at the suit's outset.

Count 7 maintains that two of the Managers injured Irwin by causing it to invest more money in the Banks even after they had failed. Fundamentally it alleges that they threw good money after bad. Again this is based on injury

that Irwin sustained in its own right, a claim that the FDIC could not pursue as the Banks' successor. (Counsel for the FDIC agreed with this proposition at oral argument.) Irwin's loss does not depend on injury to the Banks; to the contrary, Irwin's investment would have made the Banks better off. But since they were under water (so the complaint alleges) at the time of the investment, Irwin suffered an immediate and irreparable loss. This is the strongest of Irwin's claims because it potentially entails a violation of the duty of loyalty; Irwin contends that the two Managers sought to promote their own interests (as officers of the Banks) at the expense of Irwin's interests. Count 7 cannot be dismissed under §1821(d)(2)(A)(i) or Rule 8.

At oral argument the court asked counsel whether §1821(d)(2)(A)(i) should be understood not simply to allocate claims between the FDIC and other entities, but to transfer to the FDIC *all* claims held by any stockholder of a failed bank—even claims that like counts 3 and 7 do not depend on an injury to the failed bank. No federal court has read the statute that way, however, and counsel for all of the litigants declined to adopt that understanding. Section 1821(d)(2)(A)(i) transfers to the FDIC only stockholders' claims "with respect to … the assets of the institution"—in other words, those that investors (but for §1821(d)(2)(A)(i)) would pursue derivatively on behalf of the failed bank. This is why we have read §1821(d)(2)(A)(i) as allocating claims between the FDIC and the failed bank's shareholders rather than transferring to the FDIC every investor's claims of every description. Any other reading of §1821(d)(2)(A)(i) would pose the question whether Irwin and similarly situated stockholders would be entitled to compensation for a taking;

our reading of the statute (which is also the FDIC's) avoids the need to tackle that question.

The judgment of the district court is affirmed with respect to counts 1, 2, 4, and 5. It is vacated with respect to counts 3 and 7. The case is remanded for further proceedings consistent with this opinion.

HAMILTON, *Circuit Judge*. I join Judge Easterbrook's opinion for the court. His opinion accurately applies the difference between a shareholder's direct and derivative claims, which all parties agree is the decisive legal question. Counts three and seven are correctly categorized as direct claims and must be remanded, even though they do not have promising futures because of the Business Judgment Rule.

I have come to that conclusion reluctantly, however. Stepping back from the parties' arguments, I believe this case raises some broader policy questions that deserve consideration by the FDIC and Congress, including why the direct/derivative distinction should still matter, either under the current version of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, see 12 U.S.C. § 1821(d)(2)(A), or perhaps other statutory amendments that Congress may want to consider.

The most interesting facts about this case are buried in two footnotes in the briefs. They concern money that might be available to pay the plaintiff in this case, the trustee of Irwin Financial Corporation, which is the holding company that presided over this expensive debacle. The money could come from Irwin Financial's director and officer liability insurance policy.

That insurance policy covered directors and officers of Irwin Financial and all of its subsidiaries, including the defunct banks that were taken over by the FDIC. It is apparently a "wasting" policy, meaning that the legal costs of defense are charged against the policy limits and thus reduce the amount available to compensate the FDIC for its expenditures in excess of $500 million to clean up the mess. See FDIC Br. at 16 n.10; IFC Reply Br. at 19 n.17. And that mess,

we need to remember, was left behind by the entire Irwin Financial empire and its directors and officers.

To the extent those insurance proceeds might be used to pay Irwin Financial, the result is troubling. It is even more troubling because two of the three directors and officers whose actions are targeted in this case and who are covered by the insurance policy held positions with both the holding company (Irwin Financial) and its defunct banks. Under those circumstances, allowing Irwin Financial any prospect of recovery ahead of or on par with the FDIC turns the equities upside down. Yet that result follows from the parties' and our adoption of the direct/derivative dichotomy in interpreting 12 U.S.C. § 1821(d)(2)(A), which gives the FDIC extensive rights with respect to failed banks.[1]

One possible solution to the problem I see would be a broader reading of § 1821(d)(2)(A) than the parties have embraced. Section 1821(d)(2)(A) provides that when the FDIC steps in as the conservator or receiver of a failed bank, it shall succeed by operation of law to "all rights, titles, powers, and privileges of the insured depository institution, *and of any stockholder*, member, accountholder, depositor, officer, or director of such institution *with respect to the institution and the assets of the institution*."

---

[1] I recognize that, as a practical matter, the trustee at this point represents the interests of Irwin Financial's creditors rather than its shareholders. I doubt that those creditors participated in Irwin Financial's profits or the financial debacle that required the FDIC to step in. Nothing about the trustee's claims, however, depends on Irwin Financial itself having gone into bankruptcy. If Irwin Financial had managed to remain solvent itself, it would be able to assert counts three and seven as direct claims for the benefit of its own shareholders.

The parties, including the FDIC itself, and Judge Easterbrook's opinion interpret this language about the rights of a stockholder to be limited to derivative claims a stockholder might have. It is not obvious to me that the language must be interpreted so narrowly, nor did the cases cited at page 2 of the opinion confront this issue or require that result. The FDIC can already pursue what would be a derivative claim because the claim really belongs to the failed depository institution itself. So what does the language referring to "the rights … of any stockholder" add to the meaning and effect of the statute? The doctrine that statutes should not be construed to render language mere surplusage is not absolute, but it weighs in favor of a broader reach that could include direct claims. See, e.g., *Dunn v. Commodity Futures Trading Comm'n*, 519 U.S. 465, 472 (1997). If "rights … of any stockholder" was meant to refer only to derivative claims, it's a broad and roundabout way of expressing that narrower idea.

The statutory language is not precise and could be interpreted, for sound policy reasons, more broadly to include a stockholder's *direct* claims that are based on harms resulting from dealings with the assets of the failed institution, or at least claims against other persons and entities who were part of the holding company structure. Under that broader reading, it would be possible for the FDIC to go after all the insurance proceeds and other available assets in a case like this one, at least until the FDIC has been fully reimbursed for the losses it incurred to protect depositors from the folly of the banks and their parent company, plaintiff Irwin Financial.

At the core of the financial crisis of 2008 were policies that allowed bankers and other financiers to "privatize prof-

its" but "socialize losses." See, e.g., Joseph E. Stiglitz, *Freefall: America, Free Markets, and the Sinking of the World Economy* (2010). There are of course powerful reasons for the FDIC and its counterparts for credit unions and other financial institutions to play their vital roles in socializing losses to protect depositors and stabilize the economy. Any student of the Great Depression who remembers the "runs" on banks can appreciate those roles. But this case at its core presents a troubling effort. The holding company structure and the direct/derivative dichotomy are being used in ways that could allow those who ran the banks into the ground to take for themselves some of the modest sums available to reimburse the FDIC for a portion of the socialized losses they inflicted.

If that result is not contrary to federal law, it should be. I do not know whether the stakes on a national level are large enough to motivate policymakers to act, but there are several ways to accomplish that more just result. First, the FDIC could choose to modify its interpretation of the ambiguous § 1821(d)(2)(A). That course would depend on having courts accept that new interpretation. Even better, Congress could amend the statute to clarify that it does not want to let those responsible for these financial debacles push ahead of the FDIC in collecting available assets. A statutory rule giving the FDIC priority over such "direct" claims by stockholders of failed banks against others within the holding company structure would surely withstand any challenge by parties like Irwin Financial under the Takings Clause of the Fifth Amendment. And no doubt there are other ways that experts in this field could devise to protect the public interest.

Counsel for Irwin Financial's trustee pointed out in oral argument that the FDIC is supported by insurance premi-

ums collected by covered banks rather than by direct appropriations by Congress. The FDIC asserts, however, that its insurance is backed by the full faith and credit of the United States government, meaning all taxpayers. In light of that public interest and the banks' ability to socialize the losses they cause, I hope the FDIC and/or the Congress will consider this issue.