# United States Court of Appeals
## For the First Circuit

No. 17-1749

CLIFFORD A. ZUCKER, in his capacity as plan administrator of R&G
Financial Corp.,

Plaintiff, Appellant,

v.

ROLANDO RODRIGUEZ; MARIA VINA; CONJUGAL PARTNERSHIP RODRIGUEZ-
VINA; NELIDA FUNDORA; ANDRES I. PEREZ; JOSEPH R. SANDOVAL;
JACQUELINE MARIE CATES-ELLEDGE; CONJUGAL PARTNERSHIP SANDOVAL-
CATES; VICENTE GREGORIO; CARMEN A. MARTINEZ; CONJUGAL
PARTNERSHIP GREGORIO-MARTINEZ; MELBA ACOSTA; XL SPECIALTY
INSURANCE COMPANY; VICTOR J. GALAN; CONJUGAL PARTNERSHIP GALAN-
FUNDORA; FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver of
R-G Premier Bank of Puerto Rico,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Pedro A. Delgado-Hernández, U.S. District Judge]

Before

Lynch, Stahl, and Kayatta,
Circuit Judges.

Alfred S. Lurey, with whom Stephen E. Hudson, Todd C. Meyers,
Kilpatrick Townsend & Stockton, LLP, Carlos A. Rodríguez-Vidal,
and Goldman Antonetti & Córdova, L.L.C., were on brief for
appellant.
Joseph Brooks, Counsel, Federal Deposit Insurance
Corporation, with whom Colleen J. Boles, Assistant General
Counsel, and Kathryn R. Norcross, Senior Counsel, were on brief
for appellee Federal Deposit Insurance Corporation.

Andrew W. Robertson, Zwerling, Schachter & Zwerling, LLP, Roberto A. Cámara-Fuertes, and Ferraiuoli LLC on brief for appellees Joseph R. Sandoval, Jaqueline Marie Cates-Elledge, and Conjugal Partnership Sandoval-Elledge.

Andrés Rivero, Alan H. Rolnick, M. Paula Aguila, Bryan L. Paschal, and Rivero Mestre LLP, on brief for appellees Rolando Rodriguez, Andres I. Perez, Vicente Gregorio, Melba Acosta-Febo, and Victor J. Galan.

March 27, 2019

**LYNCH**, **Circuit Judge**.    In 2010, R&G Financial Corporation, a holding company, entered Chapter 11 bankruptcy after its primary subsidiary, R-G Premier Bank of Puerto Rico (the Bank), failed.  Weeks prior, Puerto Rican regulators had closed the Bank and named the Federal Deposit Insurance Corporation (FDIC) as the Bank's receiver.  The Bank's failure was one of the largest in Puerto Rico's history, costing the FDIC's Deposit Insurance Fund at least $1.2 billion.

Two years after the Bank's failure, Clifford Zucker, the plan administrator (the Administrator) for the Chapter 11 estate of R&G Financial (the Holding Company), filed this suit against six of the Holding Company's former directors and officers (the Directors) and their insurer, XL Specialty Insurance Company.[1] The Administrator's complaint alleged that negligence and breach of fiduciary duties owed to the Holding Company caused the Bank's failure and the Holding Company's resultant loss of its investment in the Bank.  The FDIC intervened to defend its interests as the Bank's receiver, arguing that the claims asserted belonged to it and not to the Administrator.  We affirm the district court's dismissal of the complaint, albeit on different reasoning.  See

---

[1]    The other defendants are the Directors' spouses and the legal conjugal partnerships formed between the Directors and their spouses.

Zucker v. Rodriguez, No. 12-CV-1408, 2017 WL 2345683, at *1 (D.P.R. May 30, 2017).[2]

The FDIC and the Directors argue that the Administrator's complaint must be dismissed because the claims he has asserted for the Holding Company are the FDIC's under 12 U.S.C. § 1821(d)(2)(A), a provision of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA). That provision provides that as receiver of a bank, the FDIC "shall . . . succeed to . . . all rights, titles, powers, and privileges of the insured depository institution, and of any stockholder . . . of such institution with respect to the institution and the assets of the institution." We agree that, under § 1821(d)(2)(A), the FDIC succeeded to the Administrator's claims, and affirm on that ground.

I.

The following facts are taken from the complaint, except where otherwise noted. Cooper v. Charter Commc'ns Entm'ts I, LLC, 760 F.3d 103, 105 (1st Cir. 2014).

A.   The Bank and the Holding Company

The Bank was established in 1983 as a federal savings bank and became a subsidiary of the Holding Company in 1994.[3]  Like

---

[2]    The district court's order captioned the case as Zuker v. Rodriguez, No. 12-CV-1408.

[3]    See Executive Summary, Office of Inspector General, Material Loss Review of R-G Premier Bank of Puerto Rico, Hato Rey, Report No. MLR-11-009 (Dec. 2010), https://www.fdicoig.gov/sites/default/files/publications/11-

other savings and loan, or thrift, institutions, the Bank's primary lending activity was home mortgages.  See Executive Summary, OIG Report; see also United States v. Winstar Corp., 518 U.S. 839, 844-45 (1996) (plurality opinion) (describing the thrift industry).  In the 2000s, the Holding Company, with its subsidiaries, was Puerto Rico's second-largest residential mortgage loan originator and servicer.  As the Holding Company's primary subsidiary, the Bank did most of this lending.[4]  Indeed, from 2009 until the Bank's failure, the Bank's assets made up over ninety percent of the Holding Company's assets.  See OIG Report at 3 n.2.

The Holding Company and the Bank had separate boards, but the same individuals served on both boards.  See id. at 3. The entities also shared a CEO.[5]  Victor Galán, a defendant here,

---

009.pdf (last visited Mar. 6, 2019) [hereinafter OIG Report]. This report, the authenticity of which is not disputed, is extensively quoted in the Administrator's complaint, has "merge[d] into th[at] pleading[]," and may be properly considered on a motion to dismiss.  See Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co., 267 F.3d 30, 33 (1st Cir. 2001) (quoting Beddall v. State St. Bank & Tr. Co., 137 F.3d 12, 17 (1st Cir. 1998)).

[4]    In 2005, the Bank accounted for sixty-six percent of the Holding Company's assets.  See OIG Report at 3 n.2.

[5]    See Complaint at 5, FDIC v. Galán-Alvarez, No. 12-CV-1029 (D.P.R. Jan. 18, 2012).  The district court took judicial notice of this complaint filed by the FDIC against officers and directors of the Bank for grossly negligent conduct that led to the Bank's failure.  Zucker, 2017 WL 2345683, at *4 n.4.  We do the same.  See E.I. Du Pont de Nemours & Co. v. Cullen, 791 F.2d 5, 7 (1st Cir. 1986) (Breyer, J.) (taking judicial notice of the

- 5 -

was the Holding Company's President and Chief Executive Officer (CEO) until 2006. He remained Chairman of both boards until December 2008, and he controlled at least fifty-eight percent of the Holding Company's stock during the relevant period. Rolando Rodríguez, also a defendant, took over as President and CEO of the Holding Company in 2007. Galán and Rodríguez also served as CEOs of the Bank while leading the Holding Company. See Complaint at 5, Galán-Alvarez, No. 12-CV-1029.

Also among the director defendants are Joseph Sandoval, Vincente Gregorio, Andres Pérez, and Melba Acosta-Febo, each of whom served at some relevant time as Executive Vice President and Chief Financial Officer (CFO) of the Holding Company. The record does not say what roles, if any, these defendants held at the Bank.

B.    Mid-2000s Accounting Fraud Scheme

While Galán and Sandoval were at the helm, the Holding Company and the Bank engaged in an accounting fraud scheme with two other major lending institutions in Puerto Rico -- First BanCorp and Doral Financial Corporation (Doral) -- and their subsidiary banks. The accounting scheme, which ran from 2002 until 2005, involved a series of transactions in which the Holding Company or the Bank transferred interest in non-conforming mortgage loans to First BanCorp, Doral, or to their subsidiary

complaint in a relevant case on a motion to dismiss).

- 6 -

banks. The participants then improperly recorded these transactions on their books as true sales; with proper accounting, the transactions would have been categorized as secured lending transactions. Categorizing the transactions as true sales allowed the participants to account for the sales as gains. Ultimately, because of the scheme, each bank holding company reported greater assets than it actually had and appeared healthier than it actually was on capital- and risk-related measures.

In 2005, investors questioned assumptions disclosed in Doral's 2004 Form 10-K used to calculate the "gains" from its transactions with the Holding Company and the Bank. In April of that year, the Holding Company publicly acknowledged that because of the accounting scheme, it would need to restate its consolidated financial statements for 2003 and 2004. The consolidated statements presented aggregated financial information for the Holding Company and its subsidiaries, including the Bank. The errors in the consolidated financial statements were sizable, in dollar terms: for example, for 2004, the Holding Company misstated its net income as $160.2 million when it had actually suffered a loss of $15.9 million.

C.    The Bank's Failure

The Administrator's complaint alleged that negligence and breach of fiduciary duties by the Directors in the aftermath of this accounting scheme led to years-long delays in the

correction of the consolidated financial statements for 2002 through 2004 and in the preparation and issuance of new consolidated financial statements for 2005 through 2008.[6] These delays, the complaint said, led to the failure of the Bank and to resulting losses to the Holding Company.

Between 2005 and 2010, the Holding Company and its subsidiaries, including the Bank, desperately needed to replenish the capital eroded during the accounting fraud and subsequent class action litigation.[7] These capital shortages were exacerbated by the 2008 collapse of the housing market in Puerto Rico and elsewhere. In 2006 and 2007, in an apparent effort to raise capital, the Holding Company had sold off several other non-bank subsidiaries. However, it retained ownership of its wholly owned mortgage lending business, R&G Mortgage Corporation, and the Bank.[8] Further capital-raising efforts faltered because, without up-to-date consolidated financial statements, it was impossible, the Administrator's complaint alleged, for the Holding Company and its

---

[6]    The restated 2002 through 2004 statements were not issued until the fall of 2007. The 2005 to 2007 statements were not issued until 2009. The 2008 statements were issued in 2010.

[7]    Several class actions related to the accounting fraud were filed in federal court in New York and Puerto Rico. After the suits were consolidated, the class actions were resolved by a court-approved settlement.

[8]    It also kept a portion of R&G Investments Corporation.

subsidiaries to access capital markets or private capital sufficient to remain solvent.

The Bank failed on April 30, 2010 when Puerto Rican regulators closed it and named the FDIC as its receiver.  By that time, the Holding Company had made R&G Mortgage a subsidiary of the Bank.  The Holding Company had transferred all of its stock interests in R&G Mortgage to the Bank to satisfy debt owed by R&G Mortgage to the Bank.  When the Bank closed, its liabilities exceeded its assets by at least $1.2 billion.  See OIG Report at 1.  This $1.2 billion difference is the estimated loss to the FDIC's Deposit Insurance Fund because of the Bank's failure.  Id.

Having lost its only significant operating subsidiary, the Holding Company filed for Chapter 11 bankruptcy in May 2010.

D.    Procedural Histories of the Administrator's Action and the FDIC's Action

The Administrator initiated this proceeding in the Holding Company's Chapter 11 case in May 2012.  The complaint's Counts I through IV alleged that the Directors acted negligently and breached their fiduciary duties to the Holding Company by failing to implement and maintain effective internal controls over financial reporting.  Counts V and VI alleged that the Directors breached a fiduciary duty of care owed to the Holding Company by failing to provide complete and accurate financial reports to the Holding Company's board.  (Recall that the financial statements

of the Holding Company and the Bank were consolidated.)  Count XI of the complaint was brought against XL Specialty Insurance Company and alleged that the claims asserted fell within the coverage provided to the Directors by XL.  Finally, Counts VII through X of the complaint were ultimately withdrawn and are discussed below.

The sole injury alleged in the complaint was the Holding Company's loss of its interest in the Bank when the Bank failed. "The loss of [the Bank] caused severe injury to [the Holding Company]," the complaint stated, "in an amount to be proven at trial but not less than $278 million."

Once the reference to the bankruptcy court was withdrawn and the case was in federal district court, the FDIC moved to intervene to protect its interests as receiver of the Bank.  Its motion informed the district court of an action filed by the FDIC alleging that gross negligence by officers and directors of the Bank in the supervision of the Bank's lending practices led to the Bank's failure.  See Complaint at 2-4, Galán-Alvarez, No. 12-CV-1029.

The FDIC's complaint named as defendants three of the defendants in this case -- Galán and Rodríguez, in their capacities as CEO of the Bank, and XL Specialty Insurance Company.  See id. at 1-2.  As stated above, Galán and Rodríguez led the Bank, the Holding Company, and both entities' boards.  Further, the same XL Specialty Insurance policy insured the officers and directors of

the Holding Company, defendants here, and the officers and directors of the Bank, defendants in the FDIC's action. Compare Complaint at 4, Galán-Alvarez, No. 12-CV-1029, with Complaint at 36, Zucker v. Rodriguez, No. 12-00270-MCF (Bankr. P.R. May 11, 2012).

After the district court granted the FDIC leave to intervene, the FDIC and the Directors moved to dismiss.[9] They argued that the Administrator lacked standing to assert his claims because the claims belong to the FDIC under 12 U.S.C. § 1821(d)(2)(A), which we quoted earlier.[10]

The Administrator then filed a notice of withdrawal of various claims that he admitted the FDIC had succeeded to under § 1821(d)(2)(A). These claims, in Counts VII through X of the complaint (and parts of Counts V and VI) alleged that the Directors had failed to implement adequate risk controls and good lending practices at the Bank. These claims overlapped with the claims brought by the FDIC in its action.

---

[9] One of the Directors instead filed a motion for judgment on the pleadings. The district court addressed this motion with the motions to dismiss. Zucker, 2017 WL 2345683, at *2.

[10] The Directors' motion also argued other grounds for dismissal not reached by the district court. Zucker, 2017 WL 2345683, at *2 & n.2. On appeal, Sandoval continues to press one of these grounds, but our disposition of the case makes it unnecessary to reach that argument.

In its order allowing the Administrator to withdraw these claims and dismissing the remainder of the complaint, the district court read § 1821(d)(2)(A) to allocate to the FDIC all claims that shareholders like the Holding Company might assert derivatively on behalf of the Bank under the relevant state law. Zucker, 2017 WL 2345683, at *3. Concluding that the Administrator's claims were derivative under Puerto Rican law and that the claims therefore belonged to the FDIC, the district court dismissed the Administrator's complaint for lack of standing. Id. at *12.

## II.

We hold, based on our interpretation of the text of § 1821(d)(2)(A), the persuasive value of the FDIC's interpretation of this provision (which it administers), and our rejection of the Administrator's interpretive arguments, that the Administrator's claims belong to the FDIC and were thus properly dismissed.[11]

We begin with a close look at the structure of federal savings and loan regulation and at FIRREA. The savings and loan industry has long been highly "regulated and . . . closely supervised" by the federal government. Winstar, 518 U.S. at 844

---

[11] The district court dismissed the complaint for lack of standing. Zucker, 2017 WL 2345683, at *1. We affirm the dismissal on the ground that the Administrator cannot state a claim upon which relief can be granted because his claims belong to the FDIC.

- 12 -

(quoting Fahey v. Mallonee, 332 U.S. 245, 250 (1947)).  Indeed, in enacting FIRREA, Congress described the thrift industry as a "federally-conceived and assisted system," one whose purpose is "to provide citizens with affordable housing funds."  H.R. Rep. No. 101-54(I), at 292 (1989).  "Every thrift," Congress explained, "is chartered by the government and consequently, voluntarily assumes an enormous public responsibility in return for deposit insurance and other government benefits."  Id. at 294.

That system was born in the Great Depression.  After forty percent of the country's home mortgages were defaulted on and almost two thousand savings institutions failed, Congress created federal agencies authorized to charter and to regulate thrifts and established federal insurance for thrift deposits.[12] See Winstar, 518 U.S. at 844; see also Home Owners' Loan Act of 1933, ch. 64, 48 Stat. 128 (1933) (codified as amended at 12 U.S.C. §§ 1461-1468); National Housing Act of 1934, ch. 847, 48 Stat. 1246, 1255 (1934) (codified as amended at 12 U.S.C. §§ 1701-1749).

---

[12]    Deposit insurance stabilizes financial institutions, and the wider economy, by guaranteeing deposits in the event of bank failure.  See, e.g., Kenneth E. Scott & Thomas Mayer, Risk and Regulation in Banking: Some Proposals for Federal Deposit Insurance Reform, 23 Stan. L. Rev. 857, 858 (1971); see also Levin v. Miller, 763 F.3d 667, 674 (7th Cir. 2014) (Hamilton, J., concurring) (describing FDIC's "vital roles in socializing losses to protect depositors and stabilize the economy").  Insurance not only replaces deposits that would be lost, but it also reassures the public about the security of their deposits, thereby preventing dangerous bank runs.  Scott & Mayer, supra, at 858.

- 13 -

Federal deposit insurance has been funded primarily by premiums collected from banks. See Kenneth E. Scott & Thomas Mayer, Risk and Regulation in Banking: Some Proposals for Federal Deposit Insurance Reform, 23 Stan. L. Rev. 857, 864 (1971) ("The purpose of charging insurance premiums . . . is to require the banking and [savings and loan] industries to cover the costs they impose on the economy."). But it is ultimately "backed by the full faith and credit of the United States government," making the taxpayers the final guarantors of losses. Levin v. Miller, 763 F.3d 667, 674 (7th Cir. 2014) (Hamilton, J., concurring); see also id. (describing deposit insurance as a form of "socializing losses") (citing Joseph E. Stiglitz, Freefall: America, Free Markets, and the Sinking of the World Economy (2010)). Indeed, Congress has on several occasions appropriated money to make up for shortfalls in the thrift deposit insurance fund. See, e.g., 12 U.S.C. § 1441b(f)(2)(E) (authorizing use of Department of Treasury funds to address insolvencies at thrift institutions after the savings and loan crisis); see also Cheryl D. Block, Measuring the True Cost of Government Bailout, 88 Wash. U. L. Rev. 149, 166-69 (2010) (discussing the role of federal funds in supporting deposit insurance).

The savings and loan crisis of the 1980s was one such occasion. Block, supra, at 167. Then, thousands of thrift institutions failed, federal agencies lacked sufficient resources

- 14 -

to address the failures, and the existing deposit insurance fund teetered toward insolvency.  See Winstar, 518 U.S. at 846-47. Congress responded with FIRREA.  See Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub. L. 101-73, 103 Stat. 183 (1989).  FIRREA not only "put the Federal deposit insurance funds on a sound financial footing."  Id. § 101 (codified at 12 U.S.C. § 1811 note).  It also restructured and expanded the government's regulatory and enforcement powers.  See Winstar, 518 U.S. at 856 (noting the "enormous changes in the structure of federal thrift regulation" made in FIRREA); see also, e.g., LaSalle Talman Bank, F.S.B. v. United States, 317 F.3d 1363, 1372-73 (Fed. Cir. 2003) (FIRREA made "a fundamental change in savings and loan regulatory policy and procedure, for the greater public benefit").

Relevant here, FIRREA transferred to the FDIC from a predecessor agency the power to act as conservator or receiver of a failed thrift institution.  FIRREA, § 212 (codified at 12 U.S.C. § 1821); see also H.R. Rep. 101-45(I), at 329-31 (noting that these powers were transferred).  In doing so, Congress aimed "to give the FDIC power to take all actions necessary to resolve the problems posed by a financial institution in default."  H.R. Rep. 101-45(I), at 329-31.  The FIRREA provision at issue defines the "General powers" of the FDIC as the "Successor to [the]

- 15 -

institution."   12 U.S.C. § 1821(d)(2).   Again, the relevant subparagraph reads:

> The Corporation shall, as conservator or receiver, and by operation of law, succeed to--
> (i) all rights, titles, powers, and privileges of the insured depository institution, and of any stockholder, member, accountholder, depositor, officer, or director of such institution with respect to the institution and the assets of the institution.

12 U.S.C. § 1821(d)(2)(A).


                            III.

     In holding that the FDIC succeeded to the Administrator's claims under § 1821(d)(2)(A), we first conclude that § 1821(d)(2)(A)(i)'s language about the "rights . . . of any stockholder . . . with respect to the institution and the assets of the institution" plainly encompasses the Administrator's claims.   We reject the Administrator's favored reading of § 1821(d)(2)(A), which limits the provision's key language to claims that shareholders may assert derivatively under state law on behalf of the institution in receivership.   There is no support in the text of § 1821(d)(2)(A) for such a judicial gloss.   Nor do the Administrator's non-textual interpretive arguments, which we evaluate in the next section, convince us to depart from our reading of the plain language.   And while the FDIC does not have much of a track record of interpreting that text in this context,

it reads the provision it administers as we read it, not as the Administrator does; the FDIC's arguments in support of its reading are persuasive.

Our ruling is a limited one: it applies only to claims like those before us. The claims are brought by a former bank holding company to recover its interest in a wholly owned subsidiary bank (a bank that made up over ninety percent of the holding company's assets). And the holding company seeks to recover from assets, like insurance, that the FDIC also seeks in its own action related to the Bank's failure. We do not establish any broader principles, and future claims by holding companies and other shareholders of banks in FDIC receivership will need to be evaluated on their own terms. With that overview in place, we turn back once again to § 1821(d)(2)(A)'s text.

When the FDIC succeeded to "all rights, titles, powers, and privileges of the insured depository institution, and of any stockholder . . . of such institution with respect to the institution and the assets of the institution," it succeeded to the Administrator's claims. 12 U.S.C. § 1821(d)(2)(A)(i). We reach that conclusion by applying the provision's terms to the claims step-by-step. Cf. New Prime Inc. v. Oliveira, 139 S. Ct. 532, 537-38 (2019) (emphasizing the importance of step-by-step reading).

- 17 -

First, the Holding Company was the Bank's sole shareholder, so the Holding Company's right to bring legal claims is a "right[] . . . of [a] stockholder" of the Bank. 12 U.S.C. § 1821(d)(2)(A)(i). As the FDIC emphasizes, although the claims allege breach of duties owed to the Holding Company by the Holding Company's officers and directors, the claims are not brought by the Holding Company qua Holding Company. Instead, the suit depends entirely on the Holding Company's position as a Bank stockholder, as it seeks to recover for lost interest in the Bank. The claims, as pleaded by the Administrator, necessarily require the Administrator to prove that, but-for the malfeasance of the Holding Company Directors, the assets of the Bank would have been much greater, and that increase in Bank assets would have inured to the benefit of the Holding Company as the Bank's parent stockholder.

Second, it follows from that reading of the complaint that the claims represent the assertion of a right of the stockholder "with respect to . . . the assets of the institution" in receivership. Id. That the claims depend on the Holding Company's proving that malfeasance by its directors depressed the Bank's assets means that the claims relate to or concern the assets of the Bank. See, e.g., Khan v. United States, 548 F.3d 549, 556 (7th Cir. 2008) (defining "with respect to" as "pertaining to" or "concerning"); cf. Lamar, Archer & Cofrin, LLP v. Appling, 138 S.

- 18 -

Ct. 1752, 1760 (2018) (defining "respecting" and "relating to").
The claims in the Administrator's complaint therefore constitute
the assertion of rights of a stockholder with respect to the assets
of the Bank.

We add that the Holding Company's right to bring the
insurance coverage claim in Count XI is a "right[] . . . of [a]
stockholder . . . with respect to . . . the assets of the
institution" for another, independent reason: the coverage under
the insurance policy is an asset shared by the Holding Company and
the Bank, so the Holding Company's competing right to that coverage
is a claim of a stockholder with respect to an asset of the Bank.
12 U.S.C. § 1821(d)(2)(A)(i).

In sum, because the Administrator's claims assert
"right[s] . . . of [a] stockholder . . . of [the Bank] . . . with
respect to the [Bank] and the assets of the [Bank]," the FDIC as
receiver succeeded to those claims "by operation of law" under
§ 1821(d)(2)(A).

The Administrator urges us to read this language about
the rights of a stockholder as limited to claims that the Holding
Company might assert derivatively under state law on behalf of the
Bank. He argues that his claims are direct under Puerto Rico law
so that, under his reading, the FDIC did not succeed to them.

The most basic problem for the Administrator's
interpretation is that the direct-derivative distinction appears

nowhere in the language of § 1821(d)(2)(A). Courts must avoid reading into statutes concepts or exceptions absent from the text, so we cannot assume, without a textual basis, that Congress intended to place such a limitation on the FDIC's power. See, e.g., Barnhart v. Sigmon Coal Co., 534 U.S. 438, 461-62 (2002) ("[C]ourts must presume that [Congress] says in a statute what it means and means in a statute what it says there." (quoting Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992))); EPA v. EME Homer City Generation, L.P., 572 U.S. 489, 508 (2014) (rejecting an interpretation that would add to the statute an "unwritten exception"); cf. United States v. Nunez, 146 F.3d 36, 40 (1st Cir. 1998) (rejecting "an unwritten limitation plucked from thin air" in the sentencing guidelines).

The Administrator points to the majority opinion in Levin v. Miller, 763 F.3d 667 (7th Cir. 2014), the only other circuit case to engage with this textual question to date. There, the majority read the phrase "rights . . . with respect to . . . the assets of the institution" to refer, just "in other words," to claims "that investors . . . would pursue derivatively." Id. at 672. Yet those concepts are not self-evidently synonymous, and the Levin majority provided no further explanation. In concurrence, Judge Hamilton disagreed with the majority's reading, writing, "[i]f 'rights . . . of any stockholder' was meant to refer only to derivative claims, it's a broad and roundabout way of

- 20 -

expressing that narrower idea." Id. at 673 (Hamilton, J., concurring).[13] We agree, and conclude that Levin's reasoning does not supply a textual basis for the Administrator's interpretation.

The other circuit cases applying § 1821(d)(2)(A) that the Administrator relies on also do not help him. Barnes v. Harris, 783 F.3d 1185 (10th Cir. 2015) and Vieira v. Anderson (In re Beach First Nat'l Bancshares, Inc.), 702 F.3d 772 (4th Cir. 2012) evaluated, using the direct-derivative distinction, whether the FDIC had succeeded to claims brought by former bank holding companies. But both did so without considering whether, under the language of § 1821(d)(2)(A), the FDIC's ownership is limited to derivative claims.

In fact, those cases are consistent with our holding that § 1821(d)(2)(A) covers the Administrator's claims. The Administrator concedes that Barnes is inconsistent with his position. There, the court held that § 1821(d)(2)(A) allocated to the FDIC claims that are, in all legally relevant respects, indistinguishable from the Administrator's. Barnes, 783 F.3d at

---

[13] The concurrence framed this point as one about avoiding statutory surplusage. Levin, 763 F.3d at 673. The parties here debate whether the Administrator's reading creates surplusage. We find the Administrator's reading unpersuasive without resort to an evaluation of those surplusage arguments. Cf. Rimini St., Inc. v. Oracle USA, Inc., No. 17-1625, 2019 WL 1005828, at *7 (U.S. Mar. 4, 2019) (recognizing, even when there may be statutory redundancy, a party may still "overstate[] the significance of statutory surplusage" arguments).

1194.  As for Vieira, that case decided that the FDIC succeeded to claims by a former holding company's trustee in bankruptcy against the holding company's directors, reasoning that the claims were based entirely on harms to the bank's assets.  702 F.3d at 779.  Here, the FDIC stresses the Administrator's concession that all of the Administrator's claims are based solely on the Bank's failure.  And the FDIC emphasizes its authority, indeed its responsibility, to recover for the same Bank failure from a similar set of defendants.

Finally, the Administrator argues that the FDIC's position should be rejected because the FDIC had not, before this litigation, advanced the reading of § 1821(d)(2)(A) that it embraces now and that we adopt.  But the FDIC has never changed its fundamental position.  In Levin, Vieira, and Barnes, as here, the FDIC said that § 1821(d)(2)(A) allocated claims like the Administrator's to the FDIC.  That those past suits were framed in state law terms does not preclude the FDIC from relying on the plain language of § 1821(d)(2)(A) here.

In this litigation, the FDIC takes the position that nothing in the language of § 1821(d)(2)(A) limits the claims to which the FDIC succeeds to claims that state law classifies as derivative.  This litigation position, the FDIC says, largely encompasses the reasoning of Judge Hamilton's concurring opinion in Levin.  See 763 F.3d at 673-74.

The FDIC adds that Congress confirmed, in a related provision, that the FDIC should own actions like the Holding Company's. The provision lays out FIRREA's priority scheme for the payment of certain claims not allocated to the FDIC. This scheme provides that claims of shareholders, "including any depository institution holding company," cannot be satisfied until after all other claims, by depositors and others. 12 U.S.C. § 1821(d)(11)(A)(v). The Administrator's interpretation, were it applied here, would allow former bank holding companies to turn this priority scheme on its head.

Finally, the FDIC says that, should we determine that § 1821(d)(2)(A) is ambiguous, then its litigation position is entitled to deference under Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944).

In the end, there is no ambiguity in Congress's choice not to limit the claims to which the FDIC succeeds to derivative claims. Our conclusion that § 1821(d)(2)(A) covers the Administrator's claims is consistent with the plain meanings of the words Congress chose. Further, compared to the Administrator's narrowing construction, our reading better reflects § 1821(d)(2)(A)'s breadth. See Pareto v. FDIC, 139 F.3d 696, 700 (9th Cir. 1998) (stating that "Congress has transferred everything it could to the FDIC"); see also Levin, 763 F.3d at 673 (Hamilton, J., concurring).

- 23 -

IV.

Ordinarily, our interpretive efforts stop when, as here, the meaning of a provision's text is plain. See, e.g., NLRB v. SW Gen., Inc., 137 S. Ct. 929, 942 (2017) ("The text is clear, so we need not consider this extra-textual evidence."); Robb Evans & Assocs., LLC v. United States, 850 F.3d 24, 34 (1st Cir. 2017) ("If the plain language of a statute elucidates its meaning, that meaning governs."). But the Administrator makes two additional interpretive arguments. Neither convinces us to depart from our reading.

A. Absurdity and Avoidance

The Administrator first argues that our reading must be avoided because it leads to an absurd result. State law, the Administrator says, does not grant the subsidiary Bank standing to bring his claims alleging breach of duties to the parent Holding Company. As a result, the Administrator contends, if § 1821(d)(2)(A) is read to allocate his claims to the FDIC as that Bank's receiver, his claims would disappear.

This resort to state law and the holding company form is unconvincing. What the Administrator's argument misses is that § 1821(d)(2)(A) itself conveys, "by operation of law," the relevant rights in the causes of action to the FDIC. For that

- 24 -

simple reason, those rights are not lost, they are transferred, and they now belong to the FDIC.[14]

Next, the Administrator objects that transferring his right in the causes of action to the FDIC would violate the Constitution's Takings Clause and should therefore be avoided. But "[t]he canon [of constitutional avoidance] 'has no application' absent 'ambiguity.'" Nielsen v. Preap, No. 16-1363, 2019 WL 1245517, at *13 (U.S. Mar. 19, 2019) (quoting Warger v. Shauers, 574 U.S. 40, 50 (2014)). Given that the text of § 1821(d)(2)(A) "cuts clearly against" the Administrator's reading, adopting that interpretation for reasons of constitutional avoidance is not an option. Id.

There is no constitutional problem in any event. The Takings Clause requires the government to provide "just compensation" before taking private property for "public use," U.S. Const. amend. V, but only for deprivations of vested property rights, see, e.g., Landgraf v. USI Film Prod., 511 U.S. 244, 266

_____

[14]     As a policy matter, vesting the holding company's claims in the FDIC is not absurd, it is sensible. That is especially true where a former holding company and the FDIC seek to recover for the same bank failure from the same pot of money (here, the same insurance policy). Vesting the claims in FDIC prevents holding companies that may have contributed to or failed to prevent the collapse of their wholly owned subsidiary banks from recovering "ahead of or on par with the FDIC" for the bank's failure. Levin, 763 F.3d at 673; see Barnes, 783 F.3d at 1195 (finding such a result "consistent with the requirement that shareholders not circumvent the interests of creditors and the FDIC").

(1994).  And, for purposes of the Takings Clause, "[i]t is well established that a party's property right in a cause of action does not vest 'until a final, unreviewable judgment has been obtained.'"  Cooperativa de Ahorro y Credito Aguada v. Kidder, Peabody & Co., 993 F.2d 269, 273 n.11 (1st Cir. 1993) (quoting Hammond v. United States, 786 F.2d 8, 12 (1st Cir. 1986)); see also Hoffman v. City of Warwick, 909 F.2d 608, 621 (1st Cir. 1990).[15]

B.   Legislative History and Legislative Intent

The  Administrator next argues that § 1821(d)(2)(A) cannot be read to cover his claims based on his view of the legislative history of a rejected amendment to FIRREA.  We will not "allow[] ambiguous legislative history to muddy clear statutory language."  Milner v. Dep't of Navy, 562 U.S. 562, 572 (2011); see also Barnhart, 534 U.S. at 457 (similar).  The text here is clear, and so this rejected amendment cannot change our result.

We find the rejected amendment irrelevant in any event. The Senate version of FIRREA initially included § 214(o), which read:

---

[15]   Other circuits have observed the same.  See, e.g., Bowers v. Whitman, 671 F.3d 905, 914 (9th Cir. 2012); Sowell v. Am. Cyanamid Co., 888 F.2d 802, 805 (11th Cir. 1989).  The Court of Federal Claims cases relied on by the Administrator are neither binding nor, in the face of this settled law, persuasive.

> In any proceeding related to any claim acquired under [§ 1821] against an insured financial institution's director, officer, employee, agent, attorney, accountant, appraiser, or any other party employed by or providing services to an insured financial institution, any suit, claim, or cause of action brought by the Corporation shall have priority over any such suit, claim, or cause of action asserted by depositors, creditors, or shareholders of the insured financial institution . . . .

S. 774, 101st Cong. § 214(o) (1989). This, as the Administrator reads it, would have given priority to the FDIC in proceedings "related" to claims the FDIC had acquired as receiver. The conference committee tasked with reconciling the House and Senate versions of the bill cut § 214(o) from the final version of FIRREA.

The Administrator asks us to infer that the conference committee's rejection of § 214(o)'s priority language means that Congress could not have intended to give the FDIC ownership of claims like his. Inferences of this sort are notoriously unreliable and are to be avoided by courts. The fact that Congress rejected a provision about one thing tells us little about what Congress intended in enacting a provision about something else. See generally William N. Eskridge, Jr., Interpreting Legislative Inaction, 87 Mich. L. Rev. 67, 94 (1988) ("[L]egislative inaction rarely tells us much about relevant legislative intent."); see NLRB v. C & C Plywood Corp., 385 U.S. 421, 426-27 (1967) (rejecting

an inference from a rejected amendment). Congress might have excluded § 214(o) for any number of reasons.

The Administrator urges that a floor statement by a member of the conference committee demonstrates that the amendment was rejected for relevant reasons. Courts do not attribute to Congress as a whole the views expressed in individual legislators' floor statements. See SW Gen., 137 S. Ct. at 943 ("[F]loor statements by individual legislators rank among the least illuminating forms of legislative history."). In any event, the primary fear expressed in the floor statement was that § 214(o) would reduce private parties' incentives to bring securities fraud suits, undermining the federal government's ability to rely on those parties to aid in anti-fraud efforts and "lead[ing] to more fraud." 135 Cong. Rec. H4985, H4989 (daily ed. Aug. 3, 1989) (statement of Rep. Staggers). But this action is not one alleging fraud or one to enforce the securities laws. Moreover, we think that allocating the Administrator's claims to the FDIC increases incentives for bank holding companies not to engage in conduct that leads to a bank's failure.

V.

The long history of extensive federal involvement in the savings and loan industry reveals that the protection of depositors and the stability of thrift institutions are paramount among congressional concerns. A strong and solvent deposit insurance

fund and an FDIC well-equipped to recover funds to address the needs of failed banks are essential to achieving those goals. We doubt that a Congress with these concerns would have intended to allow a holding company that played a role in the failure of its subsidiary bank to recover for that bank's failure at the expense of the FDIC, the deposit insurance fund, and ultimately, ordinary depositors and taxpayers. See Levin, 763 F.3d at 674 (Hamilton, J., concurring); Barnes, 783 F.3d at 1195.

The judgment of the district court is affirmed.